# IN THE SUPREME COURT OF TEXAS

═════════════
No. 11-0729
═════════════

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, PETITIONER,

v.

CITY OF WACO, RESPONDENT

═══════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════════

**Argued February 28, 2013**

JUSTICE DEVINE delivered the opinion of the Court.

Dairies that feed large numbers of cattle for extended periods in confined areas are termed "concentrated animal feeding operations" (CAFOs). Because these operations often impact their environment, they generally must obtain water-quality permits from the Texas Commission on Environmental Quality (the "TCEQ" or "Commission"). These permits are designed to control the waste produced at such facilities and through regulation prevent it from polluting nearby water sources.

When a CAFO applies for a permit, interested parties may object to the proposed permit during a comment period. These parties may also seek to intervene and request a public hearing on the proposed permit. But before granting a contested case hearing—a trial-like proceeding with

attendant expense and delay—a threshold determination must be made as to whether the party is an "affected person" with standing to request such a hearing.

In this appeal, the TCEQ granted an amendment to a dairy CAFO's water-quality permit over objections from a downstream city, which claimed that the dairy's operations under the amended permit would adversely affect the quality of the municipal water supply. The city sought to intervene in the permit process and obtain a contested case hearing. After a period for public comment and meeting, the Commission granted the amended permit without a contested case hearing, and the city sought judicial review, complaining that it was entitled to a contested case hearing because it was an "affected person." By rule, an affected person may request a contested case hearing, "when authorized by law." 30 Tex. Admin. Code § 55.201(b)(4).

The court of appeals agreed that the city was an affected person and held that the Commission abused its discretion in denying the city's request for a contested case hearing. 346 S.W.3d 781, 827 (Tex. App.–Austin 2011). The court accordingly reversed the district court's judgment, which had affirmed the Commission's decision, and remanded the matter to the TCEQ. Because we do not agree that the Commission abused its discretion in denying the hearing request, we reverse and render judgment for the Commission.

I

Waste water discharges are generally regulated and permitted through the federal Clean Water Act and the delegation of the federal National Pollutant Discharge Elimination System

("NPDES") Program to the State of Texas.[1] The Clean Water Act requires states to prepare reports every two years on the quality of water in the state and to make recommendations for reducing pollution. 33 U.S.C. § 1315. The federal act further requires states to update water-quality standards every three years. The standards are then used to set effluent limitations in water-quality permits. *Id.* § 1313(c)(1).

In Texas, the TCEQ has the primary authority to establish surface water quality standards, which it implements, in part, in its permitting actions. *See* 33 U.S.C. § 1313(a), (d); TEX. WATER CODE § 26.023; *see also id.* § 5.013(a)(3) (granting the TCEQ general jurisdiction over "the state's water quality program including issuance of permits, enforcement of water quality rules, standards, orders, and permits, and water quality planning"). The agency continually monitors and evaluates the state's water quality as part of its primary responsibility to preserve and conserve the state's natural resources. TEX. WATER CODE § 5.012. Over the past fifteen years, the TCEQ has devoted particular attention to the water quality of the North Bosque River.

The North Bosque River extends from its headwaters in Erath County, through Hamilton and Bosque Counties, and into McLennan County where it joins two other branches of the Bosque to form Lake Waco. Lake Waco serves as the municipal water supply for the City of Waco. The City owns all adjudicated and permitted rights to the water impounded in the lake, which is the sole source of drinking water for approximately 160,000 people.

---

[1] At one time, water quality protection was left largely to the states, but with the enactment of the Federal Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act, the federal government took on this responsibility. *See* 33 U.S.C. §§ 1251-1387. The Clean Water Act created a federal permitting system (the NPDES) that requires a permit of any person discharging pollutants into a surface water body.

3

In recent decades, the dairy industry in the North Bosque watershed has experienced significant growth. This, in turn, has raised concerns over the increasing volumes of animal waste produced by these dairies and the possibilities for such waste to damage the water quality of the North Bosque and, ultimately, Lake Waco.

The drinking water in Waco has historically had taste and odor problems. For many years, the City has attributed these problems to algae blooms in Lake Waco, which the City believes to be exacerbated by the proliferation of animal waste in the North Bosque watershed. As a result, the City and others have sought to impose stricter regulatory limits on dairies in the North Bosque watershed.

The Clean Water Act requires Texas and the other states to identify water bodies that do not meet, or are not expected to meet, water-quality standards. 33 U.S.C. § 1313(d)(1). In 1998, the Commission determined that two segments[2] (Segments 1255 and 1226) of the North Bosque River above Lake Waco were "impaired" under "narrative" water-quality standards "related to nutrients and aquatic plant growth."[3] Segment 1255 extends from the North Bosque's headwaters to a point just downstream from Stephenville, and Segment 1226 extends from that point to where the river flows into Lake Waco. Lake Waco itself, however, was not determined to be an "impaired" water body.

---

[2] For purposes of water quality management, the TCEQ segments the state's major surface waters.

[3] The court of appeals defined a "narrative" water-quality standard as "qualitative, somewhat subjective assessments of 'too much,' in contrast to quantitative or numeric measures." 346 S.W.3d at 793.

Once a water body is identified as impaired, the state must determine a "total maximum daily load" or TMDL for the water body. The TMDL serves to budget the maximum amount of a pollutant that a water body can receive and still meet the applicable water-quality standard. *See id.* § 1313(d)(1)(C). Following study and public comment from the City and others, the Commission determined that soluble phosphorus, which it attributed primarily to dairies' waste application fields and municipal water-treatment plants, was the key variable that could be controlled to limit algal plant growth in the North Bosque River. The Commission accordingly approved TMDLs that proposed a fifty-percent reduction in soluble phosphorus loading over time. After further study and comment (including comments from the City), the Commission in 2002 proposed an implementation plan through which dairies and cities could reduce phosphorus loadings. In 2004, the Commission amended its rules, making parts of the plan legally enforceable. *See* 30 Tex. Admin. Code §§ 321.31-321.47.

Meanwhile, in 2001, the Legislature, at the City's urging, imposed new environmental restrictions on dairy CAFOs located in a "major sole source impairment zone" (MSSIZ). *See generally* TEX. WATER CODE §§ 26.501-.504. At the time of enactment, the North Bosque watershed was the only area to which the MSSIZ legislation applied. *See id.* § 26.502 (defining major sole source impairment zone). The legislation required that new or expanded CAFOs located within a MSSIZ obtain an individual water-quality permit—a permit tailored to the dairy's particular circumstances. *See id.* § 26.503(a). Before this legislation, CAFOs in the North Bosque watershed could operate under general permits, a permit type exempted from the contested-case-hearing process. *See* 30 Tex. Admin. Code § 55.201(i)(7). The MSSIZ legislation thus effectively removed

that exemption for CAFOs covered by the statute, opening their permit proceedings to the potential for contested-case hearings.

The Commission thereafter amended its rules to incorporate the legislative changes for CAFOs in the North Bosque River impairment zone. *See* 30 TEX. ADMIN. CODE §§ 321.32-.35, .39, .48, .49. The amended rules required dairy CAFOs in the watershed to obtain individual permits when their current permits expired. *Id.* The amended rules also imposed stricter requirements on the management and disposal of wastewater and manure by the CAFOs.

About this same time, the Environmental Protection Agency adopted new rules and guidelines governing CAFOs. 40 C.F.R. § § 122, 123, 412. The federal changes expanded the federal definition of CAFOs and imposed stricter nutrient-management and record-keeping requirements on the facilities. *See id.* In response, the Commission again rewrote its rules in 2004 to mirror the federal changes, imposing more stringent controls on CAFOs, especially those in the North Bosque watershed. *See* 30 Tex. Admin. Code §§ 321.31-.47. The rules provided, however, that CAFOs needing individual permits could continue to operate under their old authorizations so long as the operator applied for an individual permit by July 27, 2004. 30 Tex. Admin. Code § 321.33(g). In March 2004, the operators of the O-Kee Dairy applied to amend their water-quality permit.

The O-Kee Dairy is in Hamilton County about 80 miles upstream from Lake Waco. It is situated a few miles from the North Bosque River but within its watershed. Under the new regulations, O-Kee needed to convert from a general to an individual permit. In its application, the

6

dairy also sought to expand its herd from 690 to 999 cows and its total waste-application acreage from 261 to 285.4 acres.

The Commission's executive director declared the O-Kee Dairy permit application administratively complete, conducted technical review, prepared a draft permit, and issued a preliminary decision that the draft permit met all statutory and regulatory requirements. The draft permit proposed to increase the dairy's maximum herd size and total waste application acreage as requested. The draft also proposed several new measures to strengthen the overall water-quality protections at the facility, even with the increase in the number of cows. These measures included reducing the possibility of discharges from the dairy's retention control structures (RCSs)[4] by, among other things, more than doubling their total storage capacity and improving monitoring of sludge and water levels. There were also new restrictions aimed at reducing the risk of waste runoff from the waste application fields. The dairy was further required to expand the size of non-vegetative buffer zones around the waste application fields and to transport excess waste off-site. The new measures purported to conform to the numerous regulatory changes imposed on Texas dairy CAFOs since the issuance of the dairy's previous water-quality permit.

The executive director's preliminary decision that the draft permit met all statutory and regulatory requirements triggered a period of public notice and comment. See TEX. WATER CODE § 5.553(b), (c). The City submitted public comments and requested a public meeting, which was granted. *See id.* § 5.554. At the conclusion of the public comment period, the executive director

---

[4] Retention control structures are ponds used to collect runoff of manure and wastewater from areas where cows are confined.

7

responded to the City's public comments, agreeing to make some changes to permit provisions governing waste application in the dairy's waste application fields or off-site, but otherwise rejecting the City's complaints. *See id.* § 5.555.

The City next filed a written request for a contested case hearing that incorporated its prior comments, replied to the executive director's responses, and identified the legal and factual issues it considered to be in dispute. *See id.* § 5.556; 30 Tex. Admin. Code § 55.201 (Texas Comm'n on Envtl. Quality, Requests for Reconsideration or Contested Case Hearing). In its request, the City asserted it was an "affected person" with a personal justiciable interest in the O-Kee permit application process. The City attached two affidavits to its hearing request–one from a professional engineer, Bruce L. Wiland, whom the City presented as an expert in water-quality analysis, the other from the City's water-utility director, Richard L. Garrett, also an engineer. The City's claim to affected-party status rested on the assertions and opinions of these two experts, which the court of appeals summarized as follows:

> • The City possesses a personal justiciable interest in the quality of the water in Lake Waco because it owns all adjudicated and permitted rights to the water impounded in the lake and uses the water as its sole source of supply for its municipal water utility, exclusive of emergency connections. The City must treat the water to ensure that it is safe for uses that include drinking and bathing and that it will be regarded as palatable by the customers to whom the City sells the water, including 113,000 City residents, approximately 45,000 residents of surrounding municipalities, and major industrial customers "that place a premium on the quality of the water they use." Otherwise, the City is placed at a competitive disadvantage in preserving and growing its water-utility customer base and, ultimately, its broader economic health.
>
> • For many years, the City has received complaints about offensive taste and odor in its drinking water. The source of these problems has proven to be a geosmin (earthy odor) produced by decaying algae that grows in Lake Waco during warm weather. Beginning in the 1980s, Lake Waco began to experience more frequent and longer

8

durations of algal blooms, with correspondingly more taste and odor problems in the City's drinking water. To counter these problems, the City has incurred escalating costs in attempting to treat the water. Despite these additional expenditures, current treatment methods (chiefly, the use of powdered activated carbon) have repeatedly fallen short of eliminating the geosmin, necessitating that the City deliver offensive smelling and tasting water to customers for the time being and that it plan and budget to install different and more expensive water-treatment systems in the future.

• There is a causal linkage between the increasing algal growths in Lake Waco (and resultant taste and odor problems in the City's drinking water) and phosphorus loading from dairies upstream in the North Bosque watershed. The North Bosque contributes approximately 64 percent of the total flow into Lake Waco and over 72 percent of the total phosphorus loading to the lake. Between 30 to 40 percent of the lake's total phosphorus load is attributable to dairy operations in the North Bosque watershed, most of which stems from runoff and discharges that occur during heavy rainstorms. This phosphorus loading attributable to dairies in the North Bosque watershed, in turn, is the primary cause of the lake's heavy algal growth.

• In addition to contributing nutrients that lead to algal growth and, ultimately, to taste and odor problems in drinking water, CAFOs in the North Bosque watershed are also a source of bacteria and other pathogens entering Lake Waco. In addition to driving up water treatment costs, the presence of these pathogens in the lake endanger the health and enjoyment of the City's many citizens who swim, fish, sail, ski, and engage in other water recreation there.

• If the problems with the proposed O–Kee Dairy permit identified in the City's comments are not remedied to any greater extent than described in the executive director's response, the increases in the dairy's herd size from 690 to 999 will increase the amounts of phosphorus and bacteria transmitted from the dairy, its waste application fields, and third-party fields into the North Bosque and downstream to Lake Waco, where it will contribute to increased algal growth, more bacteria, and the problems that follow. Although Lake Waco is approximately eighty miles downstream from the O–Kee Dairy, the distance does not substantially reduce these adverse effects because the primary mechanism through which these pollutants are transported are heavy rains, which can deliver the pollutants downstream in as little as 3–5 days.

346 S.W.3d at 795-96. Anyone may publicly comment on a pending water-quality permit, but only those commentators who are also "affected persons" may obtain a public hearing. TEX. WATER CODE § 26.028(c); 30 Tex. Admin. Code § 55.201(b).

After analyzing a non-exclusive list of factors prescribed by agency rule for making this determination, the executive director concluded that the City was not entitled to a hearing because it did not meet the requirement of an "affected person" with regard to the O-Kee Dairy permit. *See id.* § 55.203(c). The executive director accordingly recommended that the Commission deny the City's request for a contested case hearing. 30 Tex. Admin. Code § 55.209(d), (e). The City replied, filing a supplemental affidavit from its expert Wiland, who disputed the executive director's analysis and elaborated on his opinion of the causal link between claimed deficiencies in the proposed permit and water-quality problems in Lake Waco. *See id.* § 55.209(g).

After a public meeting at which the Commission considered the City's hearing request and the O-Kee Dairy permit application, *see id.* § 55.209(g), the City's hearing request was denied. *See id.* § 55.211(b). The Commission also adopted the executive director's response to public comment, approved the permit amendment, and issued the permit as the executive director proposed. Although the City was denied a contested case hearing, it was afforded several opportunities to make a record in the agency, including during the public comment period, at two public meetings, in a written request for contested case hearing, and in responses to the executive director's written comments and analysis. There is no indication that the Commission prevented the City from filing any evidence it deemed relevant to the proposed amended permit.

10

The City sought judicial review of the Commission's order in district court. *See* TEX. WATER CODE §§ 5.351, .354. The district court affirmed the Commission's decision. The City next appealed to the court of appeals, which reversed and remanded the case to the Commission. 346 S.W.3d 781, 827. The court of appeals concluded that the City was an affected person that was entitled to a contested case hearing and that "the Commission acted arbitrarily and abused its discretion in concluding" otherwise. *Id*. The Commission has appealed that decision to this Court.

II

Chapter 26 of the Texas Water Code governs CAFO water-quality permits, authorizing the TCEQ to "issue permits and amendments to permits for the discharge of waste or pollutants into or adjacent to waters in the state." TEX. WATER CODE § 26.027(a). Under this chapter, the Commission is required to give public notice of a permit application and, when requested by a commissioner, the executive director, or "any affected person," hold a "public hearing" on the application. *Id.* § 26.028(a),(c), (h). Exempt from the "public hearing" requirement, however, are applications to amend or renew a water-quality permit that do not seek either to "increase significantly the quantity of waste authorized to be discharged" or "change materially the pattern or place of discharge," if "the activities to be authorized . . . will maintain or improve the quality of waste authorized to be discharged," and meet certain other requirements. *Id.* § 26.028(d).

The term "public hearing" is not defined in chapter 26, *see id.* § 26.001 (Definitions), but in context can refer either to a hearing before the Commission or a contested case hearing before the State Office of Administrative Hearings. *See id.* § 26.020 (authorizing the Commission to hold hearings "with respect to administering the provisions of this chapter"); *id.* § 26.01 (authorizing the

11

Commission to delegate any hearing to the State Office of Administrative Hearings). Public hearings under chapter 26 can be expansive, such as a public hearing on water quality standards at which "any person may appear and present evidence" or limited, such as a public hearing on a particular application for a water quality permit. *Compare id.* § 26.024 (pertaining to public hearings on standards) *with id.* § 26.028(c) (pertaining to public hearings on permit applications). In the permit application context, the Code indicates that a public hearing means a contested case hearing under the Texas Administrative Procedure Act. *See* TEX. WATER CODE § 5.551 (referring to "an opportunity for public hearing under Subchapters C-H, Chapter 2001, Government Code, regarding commission actions relating to a permit issued under Chapter 26 [of the Water Code]"). Chapter 5, subchapter M, of the Water Code makes that connection while laying out the procedure for notice and opportunities for public comment, public meetings, and contested case hearings in the environmental permitting process. *See id.* at §§ 5.551-.559.

As part of that procedure, subchapter M provides that interested parties, who have filed comments during the process, may request a contested case hearing. *Id*. § 5.556(c). The Commission may not grant the request, however, without first determining that the requestor is an "affected person," *id.*, which subchapter M defines as:

> [A] person who has a personal justiciable interest related to a legal right, duty, privilege, power, or economic interest affected by the administrative hearing. An interest common to members of the general public does not qualify as a personal justiciable interest.

TEX. WATER CODE § 5.115(a); *see also* 30 Tex. Admin. Code § 55.103 (Agency rule incorporating same definition of "affected person"). The Commission is further delegated the authority to

12

promulgate "rules specifying factors which must be considered in determining whether a person is an affected person." TEX. WATER CODE § 5.115(a). Pursuant to that authority, the Commission has drafted the following rule:

> (c) In determining whether a person is an affected person, all factors shall be considered, including, but not limited to, the following:
>
> (1) whether the interest claimed is one protected by the law under which the application will be considered;
>
> (2) distance restrictions or other limitations imposed by law on the affected interest;
>
> (3) whether a reasonable relationship exists between the interest claimed and the activity regulated;
>
> (4) likely impact of the regulated activity on the health and safety of the person, and on the use of property of the person;
>
> (5) likely impact of the regulated activity on use of the impacted natural resource by the person; and
>
> (6) for governmental entities, their statutory authority over or interest in the issues relevant to the application.

30 Tex. Admin. Code §55.203(c)(1)-(6).

In addition to being an affected person, the requestor must timely file a written request for a contested case hearing, "identify[ing] the person's personal justiciable interest affected by the [permit] application" and "list[ing] all relevant and material disputed issues of fact that were raised during the public comment period and that are the basis of the hearing request." 30 Tex. Admin. Code § 55.201 (a), (c), (d)(2), (4); *see also* TEX. WATER CODE § 5.556(d).

After a request is filed, the executive director, the public interest counsel, or the applicant for the permit can file a response to the request. 30 Tex. Admin. Code § 55.209(d). The response must

address whether the requestor is an affected person and which issues raised in the request are disputed. The Commission then "evaluates" the request and must grant it if it is made by an "affected person" and is (1) timely filed, (2) "is pursuant to a right to hearing authorized by law," (3) complies with the form and content requirements of rule section 55.201, and (4) "raises disputed issues of fact that were raised during the [public] comment period, that were not withdrawn . . . and that are relevant and material to the commission's decision on the application." *See* 30 Tex. Admin. Code §§ 55.211(b)(3), (c).[5] The Commission's evaluation of the request is thus a threshold determination of whether the party is an "affected person" but by rule that determination "is not itself a contested case subject to the APA." *See id.* § 55.211(a).

As a matter of statutory interpretation, the court of appeals concluded that section 5.115's affected-person definition embodied the constitutional principles of standing. *See* 346 S.W.3d at 801 (observing that the "cornerstone" of the definition "denotes the constitutionally minimal requirements for litigants to have standing to challenge governmental actions in court"). The court explained that those principles required the City to establish a concrete and particularized injury in fact, not common to the general public, that is: (1) actual or imminent; (2) fairly traceable to the issuance of the permit as proposed; and (3) likely to be redressed by a favorable decision on its complaint. *Id.* at 801, 810-11.

---

[5] The Commission may also: (1) find the request deficient and proceed to act on the permit application without a hearing; (2) refer the request itself to State Office of Administrative Hearings for a contested case hearing on the sole question of whether the requestor is an "affected person"; or (3) grant a hearing request in the "public interest." 30 Tex. Admin. Code § 55.211(b)–(d).

The court concluded that the City possessed a legally protected interest in Lake Waco's water quality, distinct from that of the general public, but that the City's personal justiciable interest in the O-Kee Dairy permit application—its status as an affected party—depended on the resolution of disputed fact issues. *Id.* at 811. The court further acknowledged that the Commission had weighed the evidence and found these disputed facts against the City, reasoning that the City had failed to establish "the requisite 'concrete and particularized,' imminent injury 'fairly traceable' to the issuance of the O-Kee Dairy permit and likely redressed by denying the permit or imposing additional conditions." *Id.* The court summarized the Commission's factual determinations, bearing on the City's status as an affected party, in its opinion, writing:

· the amended O-Kee Dairy permit would not increase but reduce the risk and amount of phosphorus or pathogens being contributed by the dairy to the North Bosque River;

· any phosphorus or pollutants the dairy did contribute would be "assimilated" or "diluted" as they washed downstream so as to have no ultimate impact on Lake Waco;

· assuming any phosphorus from the dairy actually reached Lake Waco, whether it would contribute to algal growth would be, at best, speculative because (a) myriad other sources also contribute phosphorus to Lake Waco (e.g., other dairies, municipal water treatment plants), (b) other nutrients also contribute to algal growth (e.g., nitrogen from row-crop farms along the other rivers that flow into Lake Waco), and (c) many factors other than nutrients, such as sunlight and climate, influence algal growth;

· in any event, there is no connection between algal growth and episodes of taste and odor problems in Lake Waco drinking water, which predate the growth of the dairy industry in the North Bosque watershed;  and

· bacteria is not an issue in Lake Waco, which meets regulatory standards for contact recreation, and is not among the water bodies deemed "impaired" by bacteria.  Nor

15

> has North Bosque segment 1226–the segment immediately north of Lake Waco that includes the O-Kee Dairy–been deemed impaired by bacteria since 2002.

*Id.* at 811. Although not determined in a contested case hearing, the court found no reason to foreclose the Commission's discretion to consider evidence when determining "whether a 'request was filed by an affected person as defined by Section 5.115.'" *Id.* at 813 (quoting TEX. WATER CODE § 5.556(c)).

The court, however, rejected the Commission's thesis that the City could not show any concrete or imminent adverse effect or injury if the amended permit were approved simply because the amended permit was designed to be more protective of the North Bosque's water quality than the current one. The court reasoned that the relative protectiveness of the amended permit was, standing alone, irrelevant because it was an "acknowledged certainty" that there would be some discharge or runoff into the North Bosque under the amended permit. *Id.* at 822. And, if that discharge were to "harm Lake Waco's water quality and the City's legally protected interest in it, the City would have a personal justiciable interest in ensuring that the permitted activities comply with current legal requirements." *Id.* The court then concluded that "to the extent that the Commission denied the City's hearing request based on the premise that the amended O-Kee Dairy permit would be 'more protective' of the environment than the current one, it acted arbitrarily by relying on a factor that is irrelevant to the City's standing to obtain a hearing." *Id.* at 822-23.[6] Finally, the court

---

[6] Alternatively, assuming that the more protective features of the amended permit might be considered relevant to the City's standing, the court concluded that the Commission nevertheless abused its discretion in not referring the issue for a contested case hearing because of the overlap of disputed fact issues on standing and the merits of the permit application. 346 S.W.3d at 823. Concluding that the water code and Commission rules create an entitlement to a contested case hearing that is analogous to a civil claimant's right to have disputed material fact issues determined at trial, the court held that the Commission could not resolve disputed, merit-based issues relevant to standing without a contested

suggested that the Commission had conceded the City's entitlement to a contested case hearing by classifying the O-Kee Dairy permit as a "major amendment," because the City otherwise met the definition of an "affected person." *Id.* at 825.

III

The Commission complains that its classification of the O-Kee permit application as a major amendment was not a concession that the City (or for that matter an affected person) was entitled to a contested case hearing. A major amendment is defined by rule as one that "changes a substantive term . . . or a limiting parameter of a permit." 30 Tex. Admin. Code § 305.62(c)(1). A minor amendment, on the other hand, is one that "improve[s] or maintain[s] the permitted quality or method of disposal of waste" (among other things). *Id.* The Commission submits that the terms are not mutually exclusive. An application to amend a permit may fit both definitions. For example, an amendment that changes a substantive term and improves the quality of the waste discharge, the Commission submits, is both major and minor.

The distinction is significant in the first instance because a contested case hearing is not available for a minor amendment to an existing permit. 30 Tex. Admin. Code § 55.201(i)(1). But there is also no express right to a contested case hearing merely because the applicant seeks a major amendment. *See* 30 Tex. Admin. Code § 55.201(i)(5) (limiting right to contested case hearing where applicant is not applying to increase significantly the quantity of waste discharged or materially change the pattern or place of discharge, among other considerations).

case hearing. *Id.* at 824-25 (citing *Tex. Dep't of Parks and Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004).

Although the Water Code generally grants a person affected by a permit application a right to a public hearing, the Code also provides exceptions to this general rule. TEX. WATER CODE § 26.028(c), (d). Exempt from this public hearing requirement is an application to amend or renew a water-quality permit that does not seek either to "increase significantly the quantity of waste authorized to be discharged" or "change materially the pattern or place of discharge," if "the activities to be authorized . . . will maintain or improve the quality of waste authorized to be discharged," and meet certain other requirements. *Id.* § 26.028(d); *see also* 30 Tex. Admin. Code § 55.201(i)(5). Relying on this exemption, the Commission argued in the court of appeals that it could "consider a permit's likely effects in determining whether a hearing requestor is an affected person." 346 S.W.3d at 825. As noted, the court of appeals viewed the inquiry as irrelevant to the issue of the party's status as an affected person, and, in any event, conceded by the Commission as not exempt from the hearing requirement because of the "major amendment" label it attached to the application. *Id*. at 822-25. In light of the discretion the statute confers on the Commission in determining the need for a public hearing, however, we cannot agree that a proposed amended permit that purports to provide greater protection for water quality is an irrelevant consideration when evaluating the need for a public hearing.

The Commission asserts that the more protective nature of the amended permit is a relevant factor in its determination of whether the City will be affected by the permit. But whether we accept this as part of the affected person analysis, as the Commission urges, or follow the court of appeals' analysis of "affected person" as merely a codification of the constitutional principal of standing does not ultimately determine the City's right to a hearing in this case. Under either approach, we must

18

account for the Commission's discretion to limit or deny public hearings on amended permits that maintain or improve the quality of any discharge and that neither increase significantly the quantity of waste authorized to be discharged nor change materially the pattern or place of discharge. TEX. WATER CODE § 26.028(d). Thus, even assuming the City might otherwise qualify as an affected person under the statute's definition, it may still not be entitled to a public hearing if section 26.028(d)'s exception reasonably applies.

The Commission's list of factors to be considered in determining affected person status and the public hearing exemption expressed in section 26.028(d) overlap to some degree. *Compare* 30 Tex. Admin. Code § 55.203(c) *with* TEX. WATER CODE § 26.028. For example, one of the Commission's factors focuses on the "likely impact of the regulated activity on use of the impacted natural resource by the person." 30 Tex. Admin. Code § 55.203(c)(5). During the comment period, the City argued that the increase in the size of the O-Kee herd authorized by the amended permit would naturally lead to more waste and inevitably to more phosphorous and other nutrients and pathogens making their way into the North Bosque and eventually into Lake Waco, which, in turn, would increase the City's water treatment costs. The City supported its argument with expert opinion in affidavit form. One of the City's experts attested to a causal link between the increasing algal growths in Lake Waco and phosphorus loading from dairies upstream in the North Bosque watershed. This expert estimated that the North Bosque contributed about 64 percent of the total flow into Lake Waco. He further attributed about 30 to 40 percent of the lake's total phosphorus load to dairy operations in the North Bosque, stemming from runoff and waste discharges during heavy rainstorms. This source of phosphorus loading was in his opinion the primary cause of the

19

lake's heavy algal growth and resulting taste and odor problems in the City's drinking water. The executive director, however, did not agree that the proposed amendment to the O-Kee permit would have an adverse affect on Lake Waco or the City.

Relying on the sworn application, attached expert reports, the analysis and opinions of professionals on its staff, and reports, opinions and data about the North Bosque watershed gathered and analyzed by the TCEQ for nearly a decade, the executive director recommended that the Commission issue O-Kee's amended permit without a hearing. With this recommendation, he included a map and fact sheet, the draft permit, his response to public comments, and the dairy's compliance history. The fact sheet discussed the water-quality inventory for Segments 1226 and 1255, the TMDLs, the TDML implementation plan, the "White Paper" (which was also submitted by the City), and interoffice memos of the professional staff documenting their analysis of the application.

The Commission points out that a permit application to the TCEQ amounts to an affidavit with expert reports attached. The applicant must verify that the information submitted is true, accurate, and complete. 30 Tex. Admin. Code §§ 305.44(b), 321.34(b). Maps and technical reports must be prepared by a licensed professional engineer, a licensed professional geoscientist, or other qualified person. 30 Tex. Admin. Code § § 305.45(a)(6), (8), 321.34(f). The applications are then reviewed by the executive director's professional staff.

The Commission submits that the O-Kee permit was drafted by an engineer on the executive director's staff and reviewed by several other professionals. A geoscientist on the executive director's Water Quality Assessment Team evaluated the proposed permit, as did a soil

20

conservationist and an engineer at the National Resource Conservation Service and the Texas Soil & Water Conservation Board. The draft permit incorporated their comments. The Land Application Team concluded that the permit application proposed adequate buffer zones, and the Water Quality Assessment Team determined that the permit terms "are expected to preclude a permitted increase in pollutant loadings from [the dairy]."

The Commission had before it evidence that the proposed permit's modifications to the dairy's management of its wastewater and manure would reduce the pollutants from the dairy that were likely to be discharged into the watershed. There was also evidence that the more stringent waste application requirements imposed by the proposed permit would reduce the amount of phosphorus runoff from waste application fields. Indeed, the proposed permit implemented the new regulations promulgated by the Commission to comply with Environmental Protection Agency rules and guidelines governing CAFOs. *See* 40 C.F.R. § § 122, 123, 412. These new requirements were categorized by their intended goals: reduce the potential for discharges, minimize the nutrient loading to land and surface water, and increase Commission oversight of the dairy's operational activities.

The proposed permit thus requires the dairy to bring its operations into compliance with the new rules regulating CAFOs. This includes increasing its wastewater and manure retention control structure capacity by approximately 13 acre feet. The increased storage capacity is designed to reduce the number of discharges from the dairy during heavy rainfall events, and reflects that, under the new rules, CAFOs may only discharge during a 25 year/10 day rainfall event as opposed to a 25 year/24 hour rainfall event. The existing retention structures were designed to capture and retain

21

runoff from a 7.3 inch rainfall; the new structures must capture and retain runoff from a 12.2 inch rainfall. The dairy is also required to implement a retained control structure management plan to assure that it maintains wastewater volumes within the designed operating capacity of the structures, except during chronic or catastrophic rainfall events, and maintain sludge at or below the design sludge volume. These management tools reduce the likelihood of discharge during smaller rainfall events and reduce overflows associated with insufficient wastewater storage capacity.

The proposed permit also requires changes in the land application of manure and wastewater from the dairy, imposing a nutrient management plan designed to minimize nutrient loading to land and surface water through measurement of soil and waste phosphorus levels. This measurement, known as a risk potential assessment,[7] ensures that phosphorus levels remain in a proper balance, which, in turn, reduces runoff risk. Further, in order to minimize nutrient loading, the land application rate of manure and wastewater must be based on the crop's phosphorus requirements rather than its nitrogen requirements as under the old permit. For a coastal bermuda crop, all other things being equal, the result is a 40% decrease in the application rate. Manure, sludge, or wastewater in excess of that permitted to be applied to the land must be delivered to a composting facility, delivered to a permitted landfill, beneficially used by land application outside the watershed, or provided to operators of third-party fields for beneficial use in a manner consistent with

---

[7] Risk potential is determined by measuring, among other things, the current phosphorus levels in the soil, the proposed phosphorus application rate, and dairy's proximity to the nearest water body–here the Bosque. Application rates are then adjusted according to the risk potential–i.e. the higher the risk, the lower the application rate. In addition, the application rate is determined by the amount of nutrients needed for optimal crop production and then balances that need between the nutrients in the soil and the nutrient source–manure and wastewater. Once the nutrients are in balance, it is very unlikely that excess nutrients will leave the site and affect water quality.

Commission rules. The regulations on manure disposal contained in the proposed permit limit the unregulated disposal of manure and wastewater in the watershed.

Any waste stored temporarily on-site must be stockpiled in well-drained areas and adequately sloped to ensure proper drainage and prevent ponding of water. To protect against discharge, stockpiles must generally be kept beneath impermeable roofs to ensure that waste does not leave the storage area. Waste may also be composted on-site so long as it is done in accordance with Commission rules. *See* 30 Tex. Admin. Code § 332.

Excess waste that cannot be used on site must be removed. *See* TEX. WATER CODE 26.503(b)(2). Most removal methods require delivery of the waste to locations outside of the North Bosque watershed, but the Code also allows delivery of waste to third-party fields—areas of land in the watershed not owned, operated or otherwise controlled by the permitee. The City objected to this aspect of the permit, but the Commission found it to be in compliance with the rules, which require all transferred waste to be applied to those fields at the proper agronomic rate based on the soil's existing phosphorus content. 30 Tex. Admin. Code §§ 321.36, 321.40. The dairy is further prohibited from delivering manure or wastewater to a third-party field once the soil test phosphorus analysis shows a level equal to or greater than 200 ppm. Moreover, the third-party fields must be identified in the dairy's pollution prevention plan, and quarterly reports with the name, locations, and amounts of manure and wastewater transferred to operators of third party fields must be submitted. To ensure compliance with all the new requirements, the permit implements increased oversight of operational activities by the Commission. These measures require O-Kee to submit reports to the

Commission concerning, among other things, land application records, annual soil samples, and chronic rainfall discharges.

The Commission considered these management tools and found that although there will be more cows at the dairy, the overall impact of the permit's requirements will be to reduce the likelihood that phosphorus from the dairy will enter the watershed. The Commission concluded that the proposed permit would effectively decrease, rather than increase, the amount of phosphorus discharged into the watershed and thus have an overall beneficial environmental impact. It therefore rejected the City's argument that the City would be adversely affected by its granting the permit.

The City questions whether the proposed permit will improve the water quality in the North Bosque and argues that, in any event, it has a justiciable interest in the proposed permit because it authorizes the discharge of waste that ultimately affects its interests in Lake Waco. The City thus focuses on potential harm rather than any relative environmental improvement under the proposed permit. The issue, however, is whether the City has a statutory right to intervene in the permitting process and obtain a contested case hearing under the Administrative Procedure Act.

Although the APA defines "contested case" and sets the procedural framework, the agency's enabling act here sets out whether rights are to be determined after an opportunity for adjudicative hearing, and agency rules may decide whether that opportunity may include a contested case hearing. For example, this court of appeals has previously affirmed the TCEQ's rule that a request for a contested case hearing is not itself a contested case hearing, concluding that a hearing request may be decided through a less formal proceeding before the Commission. *Collins v. Tex. Natural Res. Conservation Comm'n*, 94 S.W.3d 876, 884-85 (Tex. App.–Austin 2002, no pet.).

24

*Collins* involved a poultry farm that applied for an individual water quality permit to change from a dry waste management system to a system that generated wastewater to be stored in lined lagoons and irrigated onto crop land. A neighbor to the poultry operation protested the application and requested a contested case hearing. After briefing and a limited hearing before the State Office of Administrative Hearings to determine the neighbor's proximity, the TCEQ denied the neighbor's hearing request. Construing Water Code § 5.115, as it existed before the statute's amendment in 1999, the court found that the Commission's denial of the hearing request was supported by substantial evidence. *Id*. at 885.

The *Collins* court also rejected the neighbor's claim that he was denied due process. The court reasoned that the issuance of a permit in itself does not deprive a neighboring landowner of any concrete liberty or property interest. *Id*. at 884-85. The court observed that the Commission's rules seek to protect such interests and expressly state that "the issuance of a permit does not authorize any injury to persons or property or an invasion of any other property rights." *Id*. at 884 (quoting 30 Tex. Admin. Code § 305.122(c). The court further concluded that even if a private property interest were at issue, "due process never requires all the trial-like procedures of a statutory contested case hearing." *Id*. at 885. The court of appeals accordingly upheld the Commission's denial of the neighbor's hearing request, concluding that the Commission's process for evaluating hearing requests by persons who claimed to be affected, satisfied procedural due process requirements. *Id*.

Focusing on its "affected party" analysis, the court of appeals concludes that the case here is controlled by other decisions which hold "that it is the existence of some impact from a permitted activity, and not necessarily the extent or amount of impact, that is relevant to standing." 346

S.W.3d at 822 (citing *United Copper Indus., Inc. v. Grissom*, 17 S.W. 3d 797, 802-04 (Tex. App.–Austin 2000, pet. dism'd) and *Heat Energy Advanced Tech., Inc. v. West Dall. Coal. for Envtl. Justice*, 962 S.W.2d 288, 295 (Tex. App–Austin 1998, pet. denied)). *United Copper* and *Heat Energy* likewise focus on the requestor's status as an affected person and do not otherwise consider the person's statutory right to a hearing or statutory exceptions to that right.

In *Heat Energy*, the owner of a hazardous and industrial waste storage and processing facility sought to renew its permit to conduct its business. 962 S.W.2d at 289. A coalition of nearby residents asked the Commission to conduct a contested case hearing on the renewal application. *Id.* The request was filed pursuant to section 361.088 of the Solid Waste Disposal Act, which requires the Commission to "provide an opportunity for a hearing to the applicant and persons affected" before a permit is issued, amended, extended or renewed. TEX. HEALTH & SAFETY CODE § 361.088(c). The requirement for a contested case hearing does not apply, however, when the application is to renew a permit for the storage or processing of hazardous waste that was generated on-site and not mixed with waste generated elsewhere, and the Commission has complied with the notice and comment requirements of the Water Code. *Id.* § 361.088(e); *see also* TEX. WATER CODE §§ 5.552–.555. This hearing-requirement exemption was not at issue in *Heat Energy*. Similarly, no hearing-requirement exemption was discussed, or even asserted, in *United Copper*.

The Commission complains that the court of appeals has misread the statutory exemption and agency rules that define hearing rights under chapter 26 of the Water Code. Agency rules provide that an affected person may request a contested case hearing "when authorized by law." 30 Tex. Admin. Code § 55.201(b)(4). But no right to a contested case hearing exists for "an application,

26

under Texas Water Code, Chapter 26, to renew or amend a permit" under certain circumstances. *Id*. § 55.201(i)(5). Thus, a person affected by a proposed water-quality permit has the right to request a hearing (if the person meets the statutory definition of "affected person" in section 5.115 of the Water Code), but the Commission has discretion to deny the request when the proposed permit is an amendment or renewal and (1) the applicant is not applying to significantly increase the discharge of waste or materially change the pattern or place of discharge, (2) the authorization under the permit will maintain or improve the quality of the discharge, (3) when required, the Commission has given notice, the opportunity for a public meeting, and considered and responded to all timely public comments, and (4) applicant's compliance history raises no additional concerns. TEX. WATER CODE § 26.028(d); Tex. Admin. Code § 55.201(i)(5). And again, the court of appeals has held that that determination is not itself a contested case hearing but may be made through a less formal proceeding before the Commission. *Collins,* 94 S.W.3d at 884-85. The statute similarly supports a less formal determination when section 26.028(d) applies, stating that the Commission may under these circumstances approve an application to renew or amend a permit "at a regular meeting without the necessity of holding a public hearing." TEX. WATER CODE § 26.028(d).

We conclude that there is evidence in the record to support the Commission's determination that the proposed amended permit here did not seek to significantly increase or materially change the authorized discharge of waste or otherwise foreclose Commission discretion to consider the amended application at a regular meeting rather than after a contested case hearing. The Commission therefore did not abuse its discretion in denying the City's request for a contested case hearing on O-Kee's application for an amended permit.

The court of appeals' judgment remanding the matter to the Commission for a contested case hearing is accordingly reversed and judgment is rendered affirming the Commission's decision to deny the hearing request.

_____
John P. Devine
Justice

Opinion Delivered: August 23, 2013