ACCEPTED
15-24-00132-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/21/2025 7:40 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-24-00132-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/21/2025 7:40:00 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

AIRW 2017-7, L.P., 600 WESTINGHOUSE INVESTMENTS, LLC; 800
WESTINGHOUSE INVESTMENTS, LLC; TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY; and JONAH WATER SPECIAL UTILITY DISTRICT,
*Appellants,*

v.

CITY OF GEORGETOWN, TEXAS
*Appellee.*

On Appeal from the 261st District Court of Travis
County, Texas, Cause No. D-1-GN-23-001004

## BRIEF OF APPELLEE CITY OF GEORGETOWN, TEXAS

William A. Faulk, III
State Bar No. 24075674

Carlota Hopinks-Baul
State Bar No. 24094039

Kelsey E. Parker
State Bar No. 24143891

**SPENCER FANE LLP**
816 Congress Ave., Suite 1200
Austin, TX 78759
Telephone:     (512) 840-4550
Facsimile:     (512) 840-4551

**ATTORNEYS FOR APPELLEE,
CITY OF GEORGETOWN**

# IDENTITY OF PARTIES AND COUNSEL

**Intervenor-Defendants /
Appellants:**
AIRW 2017-7, L.P.; 600 Westinghouse
Investments, LLC; and 800
Westinghouse Investments, LLC

**Counsel for Intervenor-Defend-
ants / Appellants:**
Andrew B. Davis
Texas Bar. No. 24082898
andrew@lkcfirm.com
William T. Thompson
Texas Bar. No. 24088531
will@lkcfirm.com
Todd Disher
Texas Bar. No. 24081854
todd@lkcfirm.com
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701

Helen S. Gilbert
Texas Bar No. 00786263
hgilbert@bartonbensonjones.com
Barton Benson Jones, PLLC
7000 N. MoPac Expwy, Suite 200
Austin, TX 78731

Edmond McCarthy
Texas Bar No. 13367200
Ed@ermlawfirm.com
McCarthy & McCarthy, LLP
1122 Colorado St., Suite 2399
Austin, TX 78701

**Counsel for Plaintiff / Appellee:**
William A. Faulk, III
Texas Bar No. 24075674
CFaulk@spencerfane.com
Carlota Hopinks-Baul
Texas Bar No. 24094039
CHBaul@spencerfane.com
Kelsey E. Parker
State Bar No. 24143891
kparker@spencerfane.com
Spencer Fane, LLP
816 Congress Ave., Ste. 1200
Austin, TX 78701

**Intervenor-Defendant /
Appellant:**
Jonah Water Special Utility District

**Counsel for Intervenor-Defendant /
Appellant:**
John J. Carlton
Texas Bar No. 03817600
john@carltonlawaustin.com
Kelli A. N. Carlton
Texas Bar No. 15091175
kelli@carltonlawaustin.com
Erin R. Selvera
Texas Bar No. 24043385
erin@carltonlawaustin.com
The Carlton Law Firm, P.L.L.C.
4301 Westbank Drive, Ste. B-130
Austin, TX 78746

i

**Defendant-Appellant:**
Texas Commission on
Environmental Quality

**Counsel for Defendant-Appellant:**
Sara J. Ferris
Assistant Attorney General
Texas Bar No. 50511915
Sara.Ferris@oag.texas.gov
Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, TX 78711-2548

**TABLE OF CONTENTS**

**PAGE(S)**

IDENTITY OF PARTIES AND COUNSEL ...............................................................I

TABLE OF CONTENTS..................................................................................III

GLOSSARY OF TECHNICAL TERMS.............................................................V

INDEX OF AUTHORITIES .............................................................................VI

STATEMENT OF THE CASE ....................................................................... VIII

STATEMENT REGARDING ORAL ARGUMENT ................................................ IX

ISSUES PRESENTED .....................................................................................X

STATEMENT OF FACTS ................................................................................. 1

STANDARD OF REVIEW................................................................................. 4

ARGUMENT AND AUTHORITIES...................................................................... 7

    A.    The Commission improperly applied the State's regionalization policy. ....................................................................................... 7

    B.    The Commission's evidence for denial of service was not supported in the law. ........................................................................... 12

    C.    AIRW and the Commission misconstrue Texas's Regionalization Policy........................................................................................ 21

    D.    The District Court properly applied the legal standards in reversing and remanding the Permit. .............................................. 22

    E.    The Commission's misapplied its own rules in considering hypothetical loss in value.......................................................... 25

    F.    Whether the wastewater treatment service is within the City's ETJ or another's service area does not affect the Commission's defective regionalization analysis. ....................................................... 29

    G.    TCEQ erred in concluding the Permit is protective of water quality and the existing uses of the receiving waters. .................................. 30

    H.    TCEQ adopted a permit that is noncompliant with its antidegradation policy and procedures. ............................................ 32

    I.    The AIRW Permit is in violation of applicable requirements regarding nuisance odors. ......................................................... 35

    J.    The Permit does not protect human health or provide for sufficient operational requirements............................................................ 38

    K.    The Permit Application was not substantially complete and accurate......................................................................................... 39

PRAYER.................................................................................................... 40

CERTIFICATE OF COMPLIANCE.................................................................. 41

**CERTIFICATE OF SERVICE** ................................................................. 42

## GLOSSARY OF TECHNICAL TERMS

| CCN | Certificate of Convenience and Necessity |
| --- | --- |
| DO | Dissolved oxygen |
| IPs | Procedures to Implement the Texas Surface Water Quality Standards |
| PUCT | Public Utility Commission of Texas |
| Tex. Admin. Code | Texas Administrative Code |
| TCEQ | Texas Commission on Environmental Quality |
| TPDES | Texas Pollutant Discharge Elimination System |
| Tex. Water Code | Tex. Water Code |
| WQS | Texas Surface Water Quality Standards |
| UDC | Plaintiff's Unified Development Code |

# INDEX OF AUTHORITIES

**PAGE(S)**

**Cases**

*Ammonite Oil & Gas Corp. v. R.R. Comm'n of Tex.,*
  698 S.W.3d 198 (Tex. 2024) .................................................................................... 6

*Cent. Power & Light Co. v. City of San Juan,*
  962 S.W.2d 602 (Tex. App. 1998) ........................................................................ 24

*City of Austin v. Whittington,*
  384 S.W.3d 766 (Tex. 2012) ................................................................... 19, 24, 25

*City of Denton v. Grim,*
  694 S.W.3d 210 (Tex. 2024) ..................................................................... 17, 18, 24

*City of El Paso v. Pub. Util. Comm'n of Tex.,*
  883 S.W.2d 179 (Tex. 1994) .................................................................................... 5

*City of San Benito v. Rio Grande Valley Gas Co.,*
  109 S.W.3d 750 (Tex. 2003) ................................................................................. 24

*City of Waco v. Texas Comm'n on Envtl. Quality,*
  346 S.W.3d 781 (Tex. App.—Austin 2011) ........................................................... 6

*Heritage on the San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality,*
  393 S.W.3d 417 (Tex. App.—Austin, 2012) .......................................................... 5

*Jenkins v. Crosby Indep. Sch. Dist.,*
  537 S.W.3d 142 (Tex. App. 2017) ........................................................................ 6

*Mayhew v. Town of Sunnyvale,*
  964 S.W.2d 922 (Tex. 1998) ................................................................................. 20

*Morath v. Lampasas Indep. Sch. Dist.,*
  686 S.W.3d 725 (Tex. 2024) ................................................................................. 19

*Mosley v. Texas Health & Hum. Servs. Comm'n,*
  593 S.W.3d 250 (Tex. 2019) .................................................................................... 4

*Pub. Util. Comm'n v. Gulf States Utils.,*
  809 S.W.2d 201 (Tex. 1991) .................................................................................... 5

*Save Our Springs All., Inc. v. Texas Comm'n on Env't Quality,*
  No. 23-0282, 2025 WL 1085176 (Tex. Apr. 11, 2025) ................................. 6, 33, 34

*Texas Architectural Aggregate, Inc. v. Texas Comm'n on Env't Quality,*
  No. 03-22-00169-CV, 2023 WL 8459511 (Tex. App. Dec. 7, 2023) ...................... 5

*Texas Comm'n on Env't Quality v. Friends of Dry Comal Creek,*
  669 S.W.3d 506 (Tex. App. 2023) .......................................................................... 6

*Texas Comm'n on Env't Quality v. Maverick Cnty.,*
  642 S.W.3d 537 (Tex. 2022) ........................................................................... 15, 16

*Texas Comm'n on Env't Quality v. San Antonio Bay Estuarine Waterkeeper,*
  No. 15-24-00036-CV, 2025 WL 1442924 (Tex. App. May 20, 2025) ................. 5, 6

**Statutes**

Tex. Gov't Code Ann. § 2001.171.................................................................. 10
Tex. Gov't Code Ann. § 2001.174(2) ............................................................... 6
Tex. Gov't Code § 2001.174(2)(A)–(F) ........................................................... 5
Tex. Gov't Code § 2003.047(i-1) .................................................................... 41
Tex. Gov't Code § 2003.047(i-2) .................................................................... 42
Tex. Gov't Code §§ 2001.001–.903 ................................................................. 4
Tex. Loc. Gov't Code § 212.172 ...................................................... 31, 32, 33
Tex. Water Code § 26.027(a).......................................................................... 21
Tex. Water Code § 5.351 ................................................................................... 5
Tex. Water Code § 13.244(c) .......................................................................... 41
Tex. Water Code § 26.023 .............................................................................. 45
Tex. Water Code § 26.027 .............................................................................. 42
Tex. Water Code § 26.027(b)...................................................................... 54, 55
Tex. Water Code § 26.0282 ...................................................................... passim
Tex. Water Code § 26.030(b)............................................................ 49, 51, 52
Tex. Water Code § 26.081 ....................................................................... 11, 38
Tex. Water Code § 26.003 and § 26.0282 ............................................... passim

**Regulations**

16 Tex. Admin. Code § 24.225(c) ................................................................... 41
30 Tex. Admin. Code Ch. 307 ........................................................................ 42
30 Tex. Admin. Code Ch. 307 ........................................................................ 44
30 Tex. Admin. Code § 39.418 ....................................................................... 54
30 Tex. Admin. Code § 305.1 ......................................................................... 21
30 Tex. Admin. Code § 307.4-5 ................................................................ 43, 48
30 Tex. Admin. Code § 307.5(b)(2) ....................................................... 44, 46, 47
30 Tex. Admin. Code § 309.10(a)............................................................ 49, 50
30 Tex. Admin. Code § 309.13 ................................................................. 49, 51

# STATEMENT OF THE CASE

**Nature of the Case:**

This suit is an appeal of the trial court's reversal of a final Order of the Texas Commission on Environmental Quality ("Commission" or "TCEQ"). The Commission issued a Texas Pollutant Discharge Elimination System permit to construct and operate a new wastewater treatment plant in Williamson County, Texas.

**Course of Proceedings:**

The Commission granted AIRW a TPDES permit to serve a new residential community development in the extraterritorial jurisdiction of the City of Georgetown (the "City") via final order. The City sought judicial review of the TCEQ's final order in Travis County District Court. After considering the briefing on all issues and holding a hearing, the District Court entered an order reversing and remanding to the Commission on regionalization. CR at 730-731.[1]

**Trial Court:**

Honorable Laurie Eiserloh, 261st Judicial District Court, Travis County

**Trial Court Disposition**

The District Court reversed the TCEQ's Order for two stated reasons and remanded for further proceedings consistent with the order.

---

[1] The Administrative Record (AR) was admitted into evidence at the hearing on the merits as Joint Exhibit 1. RR at 5. The AR consists of four components: Documents, Exhibits, Public Comments, and Transcripts.

**STATEMENT REGARDING ORAL ARGUMENT**

The Commission and AIRW have requested oral argument in this appeal. While this case does involve a complex regulatory-permitting process, the parties have provided more than an adequate explanation of that regulatory scheme and its history. The ultimate issue concerning the Commission's improper application of the legislatively mandated regionalization requirements is clear, thus negating the need for oral argument and use of the Court's judicial resources.

**ISSUES PRESENTED**

1. Did the District Court appropriately reverse the final order of the Commission based upon the court's disagreement with the Commission's regionalization determination and related findings?

2. Was the final order of the Commission, granting the TPDES permit, supported by substantial evidence and based upon applicable law and reasoned decision-making?

## STATEMENT OF FACTS

This case is an appeal of the Travis County District Court decision to reverse and remand the issuance of Texas Pollutant Discharge Elimination System ("TPDES") Permit No. WQ0015878001 ("Permit") to AIRW 2017-7, L.P. ("AIRW"). 2 AR 073. If the District Court's decision were overturned and the Permit's issuance were upheld, the Permit would grant AIRW the authority to discharge up to 200,000 gallons per day of treated domestic wastewater from a proposed wastewater treatment facility into waters of the state within the extraterritorial jurisdiction ("ETJ") of the City of Georgetown ("City"). *Id*.

After a contested case hearing before the State Office of Administrative Hearings ("SOAH"), the Texas Commission on Environmental Quality ("TCEQ") issued the Permit via a final order on November 28, 2022. 1 AR 66. The City timely filed a Motion for Rehearing on December 23, 2022, which was overruled by operation of law on January 22, 2023, exhausting all administrative remedies. 1 AR 67. Subsequently, the City timely filed an appeal in state District Court on February 21, 2023. CR 5. On October 31, 2024, the District Court held a hearing on the merits (RR 1), and on December 2, 2024, it reversed and remanded the case to the TCEQ for further proceedings. CR 730-31 (City of Georgetown, Texas v. Tex. Comm'n on Envt'l Qual., No. D-1-GN- 23-001004 (261st Dist., Travis County, Dec. 2, 2024) (Final Judgment Reversing Order of the Texas Commission on Environmental Quality)) ("Final Judgement"). On December 9, 2024, AIRW filed a Notice of Appeal, followed by TCEQ's on December 20, 2024.

1

## SUMMARY OF THE ARGUMENT

The decision of the District Court to reverse the TCEQ's issuance of a wastewater discharge permit to AIRW is firmly grounded in law, fact, and longstanding policy. That judgment should be upheld. At every stage, AIRW's Application violated the core statutory prerequisites for wastewater permitting in Texas. TCEQ's issuance of the Permit was not only unsupported by substantial evidence, it represents a flagrant disregard of the Legislature's mandate to prioritize regional solutions over ad hoc, developer-driven infrastructure.

Foremost, the Permit flies in the face of Texas' statutory regionalization policy, codified in Tex. Water Code § 26.003 and § 26.0282. AIRW sought approval for a standalone package wastewater treatment plant despite the undisputed availability of regional service from the City of Georgetown—a qualified, active, and capable provider. The record reveals that AIRW made no genuine effort to pursue regionalization, instead devising a façade of outreach through informal, non-binding communications with city staff. TCEQ's rubber-stamping of these efforts as sufficient "coordination" makes a mockery of its own regulations and past precedent. The District Court's determination that the Permit did not comply with Texas' regionalization policy was correctly deduced, as regionalization is not merely a box-checking exercise; it is a statutory imperative. TCEQ's willful disregard for this obligation undermines statewide policy and invites the proliferation of disjointed, less economically efficient facilities.

2

Notwithstanding regionalization, the Permit fails to protect water quality and public health as required under the Texas Surface Water Quality Standards. AIRW's Application was bereft of accurate hydrological data, ignored site-specific conditions, and failed to assess the actual uses and ecological value of the receiving stream. Neither AIRW nor TCEQ performed the necessary due diligence to evaluate how the discharge would affect water quality or aquatic life. Even TCEQ staff admitted that no fieldwork was conducted, and that narrative criteria (that are no lesser legal standards for their absence of numerical values)—such as aesthetic and wildlife considerations—were overlooked. This abdication of regulatory oversight left downstream residents and ecosystems exposed to unnecessary risk and stripped the Permit of any claim to scientific legitimacy.

The Permit's deficiencies are not merely technical—they pose direct risks to human health. The proposed discharge route cuts through residential neighborhoods and over mapped dry land. TCEQ approved this configuration without confirming even the existence of the proposed waterbody at the point of discharge or mandating meaningful safeguards to prevent nuisance conditions during inevitable operational malfunctions or other service disruptions. The permit's failure to require redundant units and storage facilities as a backup for treatment failures or power outages, combined with its reliance on generic permit language, reveals a facility ill-suited to protect neighboring communities. The permitting process ignored the context-specific health and safety implications of the discharge and instead relied on rote assumptions and boilerplate conditions.

3

Additionally, the Application's factual defects and TCEQ's flawed review independently justify denial. AIRW materially misidentified land ownership, omitted the legally necessary co-permittee (Jonah Water Special Utility District), and submitted flawed maps, incomplete notices, and contradictory information. Rather than reject the Application or require correction, TCEQ approved it wholesale—an act the Court has the right to deem arbitrary and capricious.

In sum, the District Court's judgment is not only correct, but also essential to uphold the statutory, scientific, and procedural integrity of environmental regulation in Texas. This case is not about deference to agency expertise; it is about enforcing legislative mandates, protecting the water of the state, and ensuring that regulatory processes are not reduced to hollow formalities. The reversal of TCEQ's Permit was not merely justified—it was required. This Court should affirm.

## STANDARD OF REVIEW

The Texas Administrative Procedure Act ("APA") governs this appeal. Tex. Gov't Code §§ 2001.001–.903; *Mosley v. Texas Health & Hum. Servs. Comm'n,* 593 S.W.3d 250, 258 (Tex. 2019) ("[The APA applies] to all state agencies and the processes for judicial review of their decisions."). Accordingly, this Court, like the District Court, must determine whether substantial rights "have been prejudiced because the administrative findings, inferences, conclusions, or decisions" of the Commission are "in violation of a constitutional or statutory provision;" "in excess of the [TCEQ's] statutory authority;" "made through unlawful procedure;" "affected by other error of law;" "not reasonably supported by substantial evidence considering

4

the reliable and probative evidence in the record as a whole;" or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." *Texas Architectural Aggregate, Inc. v. Texas Comm'n on Env't Quality*, No. 03-22-00169-CV, 2023 WL 8459511, at *4 (Tex. App. Dec. 7, 2023) (citing Tex. Gov't Code § 2001.174(2)(A)–(F)); *See* Tex. Water Code § 5.351.

A court may reverse an agency decision "as arbitrary and capricious, independent of whether there is substantial evidence in the record, if its decision constitutes a clear abuse of discretion." *Texas Comm'n on Env't Quality v. San Antonio Bay Estuarine Waterkeeper*, No. 15-24-00036-CV, 2025 WL 1442924, at *10 (Tex. App. May 20, 2025). An agency's action is arbitrary or an abuse of discretion if it fails to consider a mandatory factor, considers an irrelevant factor, considers appropriate factors but reaches a completely unreasonable result, or fails to follow its own regulations. Tex. Gov't Code Ann. § 2001.174(2); *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994); *Pub. Util. Comm'n v. Gulf States Utils.*, 809 S.W.2d 201, 207 (Tex. 1991); *Heritage on the San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality*, 393 S.W.3d 417, 423 (Tex. App.—Austin, 2012).

In addition to the arbitrary and capricious review standard outlined above, the Texas courts must also make two inquiries under the substantial evidence standard of review:

(1) whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn,

5

(2)  whether the findings of underlying fact are reasonably supported by the evidence.

*Jenkins v. Crosby Indep. Sch. Dist.,* 537 S.W.3d 142, 149 (Tex. App. 2017).

While an agency is given deference in its field of expertise, the test under the substantial evidence review remains a test of reasonableness. *Save Our Springs All., Inc. v. Texas Comm'n on Env't Quality*, No. 23-0282, 2025 WL 1085176, at *7 (Tex. Apr. 11, 2025) (quoting *Ammonite Oil & Gas Corp. v. R.R. Comm'n of Tex.*, 698 S.W.3d 198, 207 (Tex. 2024)).  Simply put, a substantial evidence review considers whether the record demonstrates a reasonable basis for the agency's action. *Id.*  Unless proven otherwise, an agency's findings, inferences, conclusions, and decisions are presumed to be sufficient. *Save Our Springs* at *7.  If an administrative decision is supported by substantial evidence, it is generally not arbitrary and capricious; however, "instances may arise where the agency's action is supported by substantial evidence but is nonetheless arbitrary and capricious." *Texas Comm'n on Env't Quality v. Friends of Dry Comal Creek*, 669 S.W.3d 506, 517 (Tex. App. 2023), review denied (Sept. 29, 2023).  For example, an appellate court must remand an agency's decision for arbitrariness if it finds that the agency "has not actually taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making."  *Id.* (citing to *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819–20 (Tex. App.—Austin 2011), rev'd on other grounds, 413 S.W.3d 409 (Tex. 2013)).

When a TCEQ's decision to grant a wastewater discharge permit is reviewed for substantial evidence, it is subject to a de novo review. Tex. Gov't Code Ann. § 2001.171; *San Antonio Bay Estuarine Waterkeeper* at *12 (Tex. App. May 20, 2025).

6

## ARGUMENT AND AUTHORITIES

**A. The Commission improperly applied the State's regionalization policy.**

The District Court ruling should be upheld because the Permit contravenes TCEQ's statutory mandate to "encourage and promote" the regionalization of wastewater infrastructure. Tex. Water Code § 26.081. Because the Commission did not prepare a permit in compliance with Texas's regionalization policy, it failed to follow its statutory requirements, and as a result, acted arbitrarily.

Regionalization is the consolidation of multiple wastewater collection and treatment systems into regional facilities to serve large populations over a broad geographic coverage area. 2 AR 98. Practically, it is the process of connecting new developments to existing wastewater collection systems rather than constructing a new wastewater treatment plant (WWTP) to protect the health, safety, and welfare of the people of the state. *Id.* The state implements this policy to operate wastewater systems on an economy of scale and to reduce the infrastructure footprint by avoiding the construction of multiple, unnecessary facilities.

In issuing wastewater discharge permits, the Commission is tasked with (1) only issuing permits that are consistent with the State's regionalization policy and (2) conducting a technical review based on water-quality assessments. The former requirement is governed by Tex. Water Code § 26.081, where the Legislature requires TCEQ to implement a policy to "encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state and to prevent pollution and maintain

7

and enhance the quality of the water in the state," also known as the "Texas Regionalization Policy." *See* 2 AR 146.

It is undisputed that the regionalization analysis is built into the Commission's review process of each permitted discharge. TCEQ Br. at 24. Specifically, it is incorporated into the Commissions consideration of (1) need (of a new or expanded permit) and (2) availability (of existing systems to connect to). Tex. Water Code § 26.0282, see TCEQ Br. at 24–25. This statutory regionalization policy grants TCEQ the authority to

> deny or alter the terms and conditions of the proposed permit, amendment, or renewal based on **consideration of need**, including the expected volume and quality of the influent and the **availability** of existing or proposed areawide or regional waste collection, treatment, and disposal systems not designated as such by commission order pursuant to provisions of this subchapter.

Tex. Water Code § 26.0282 (emphasis added).

The Commission also relies on its informal guidance on its website to apply its statutory requirements under the Water Code. 2 AR 98. For example, to implement the above "availability inquiry," TCEQ requires that owners and operators of proposed new WWTPs evaluate options for regionalization and document such efforts before applying for a discharge permit for a new WWTP. *Id.* 2 AR 98 at AIRW000383. This includes identifying all permitted domestic WWTPs or sanitary sewer collection systems within a three-mile radius of a newly proposed facility, if any. *Id.* This process is outlined in the permit application instructions and TCEQ guidance document entitled "Evaluating Regionalization for Proposed Wastewater Systems." 2 AR 146. If one exists within the three-mile radius, TCEQ requires that owners and

8

operators of proposed new WWTPs request service from the existing system and document the ensuing discussions. *Id.* The request for service must include the volume of the proposed facility's discharges, an inquiry into the total cost to connect to the existing sewer system and providing sewer services, as well as any additional conditions for receiving service. *Id.*

As reflected in the administrative record, there are three WWTP within the three-mile radius of AIRW's proposed package plant:

- The City's Dove Springs Wastewater Treatment Plant has a permitted capacity of 2.5 million gallons per day. 2 AR 152 at GT PFT 0000325; 2 AR 134 at 17:12.

- The City also has an existing wastewater collection system within a three-mile radius (in the Kasper/Fairhaven Subdivision, which is just northwest of the proposed package plant). 2 AR 134 at 17:15–20.

- An additional wastewater collection system is under construction in the Patterson Ranch Subdivision, which is adjacent to the north of the proposed package plant and will be operated by the City. 2 AR 131 at 15:11–12, 21:15–18, 22:1–23:2; 2 AR 139; 2 AR 115.

Given the proximity to the abovementioned existing facilities, AIRW should have provided certified copies of the correspondence it sent to the City, plus any responses regarding the City's available capacity or willingness to expand to accept the volume of wastewater proposed in the Application. AIRW did not do so. 2 AR 74 at bates p. 00077. Because TCEQ failed to enforce the most basic procedural

9

requirements of the availability inquiry, its approval of AIRW's Permit is inconsistent with the very few regionalization policy procedures in place. Thus, the Commission reached a decision made through unlawful procedure.

TCEQ also contends that the "Application and evidence developed during the contested-case process" met the necessary burden to prove that a permit in this instance was consistent with the Texas regionalization policy. TCEQ Br. at 24. Yet TCEQ only specifically points to the "costs related to annexation-related diminution in property value," which weighed in favor of granting the Permit. TCEQ Br. at 26. This so called "cost" was understood by the Commission as a denial of service. *Id*. While it is correct that the Commission has the discretion to consider denial of service, costs, and other relevant factors when following the regionalization policy, it does not have the authority to determine property value reduction as effectively denying service. TCEQ Br. at 26; *See* Tex. Water Code § 26.0282. TCEQ's consideration of "the approximately $20 million cost due to diminution in property value" as constituting a "cost of connecting" to the City's WWTF that weighs in favor of granting AIRW's Application is the quintessence of arbitrariness and capriciousness.

Not only is the alleged diminution in value entirely speculative (as it may accrue, if at all, in the future when the property is sold), it is not a "cost" to Appellant AIRW; rather, the alleged future diminution in value would affect a party that is an affiliate of AIRW, not AIRW itself. Thereby, TCEQ:

10

- improperly considered irrelevant facts (the property value interests of third parties);

- failed to consider relevant facts (i.e., the availability of existing regional wastewater facilities, Tex. Water Code § 26.0282; the $300,000 higher cost of building the proposed WWTF. 1 AR 66 at 7.

- improperly considered non-statutory criteria (a third party-real estate developer's financial interests);

- failed to consider relevant factors (i.e., the encouragement and promotion of the use of regional waste collection, treatment and disposal systems to serve the waste disposal needs of the citizens of the state, Tex, Water Code § 26.003; the consideration of need, including the expected volume and quantity of the wastewater (all of which the City's WWTF has capacity to treat), *id.* § 26.0282; and

- a violation of statutory provisions (i.e., the requirement to "use [] all reasonable methods to implement this policy," *id.* § 26.003).

TCEQ's consideration of the alleged diminution in value also constitutes an abuse of discretion inasmuch as TCEQ has interpreted its various permitting authorities to *not* allow the agency to consider "effects on property values" when reviewing comments on proposed permits submitted by persons who claim to suffer from diminished property values due to the permitted activity, yet it deigns to do so for developers—despite their claimed interests and harms being exactly the same as the persons objecting to the Permits' issuance. *See* Concerns Outside of TCEQ's

11

Authority, available at: https://www.tceq.texas.gov/agency/decisions/participation/permitting-participation/concerns-outside-of-tceqs-authority. To the extent that TCEQ's TPDES permitting authorities do not allow it to consider diminution in property values, its having done so for the benefit of affiliates of Appellant AIRW also represents an exceedance of the agency's authority, warranting reversal. In addition, TCEQ's consideration of the alleged, future diminution in a third party's property value as justification for issuance of a permit misinterprets and is at odds with the statutory provisions regarding the state's regionalization by favoring the *grant* of permits which result in *balkanization*—instead of denying permits based on (lack of) need and encouraging regionalization. *Id*. § 26.0282.

Ultimately, denial of service and costs are two different considerations. Cost does not amount to denial because it's high; rather, a high cost becomes a more significant factor to consider in the overall evaluation. Thus, it was unreasonable for the Commission to conclude that it was following the regionalization policy, when it considered a factor that it considers irrelevant for other parties in its review process.

**B. The Commission's evidence for denial of service was not supported in the law.**

Tex. Water Code § 26.003 directs the TCEQ to use "*all reasonable methods* to implement the [Regionalization] policy." (emphasis added). These reasonable methods include the discretion to deny a proposed wastewater treatment permit based on the *availability* of existing or proposed areawide or regional waste collection. Tex. Water Code § 26.0282 (emphasis added). This is because the goal of

regionalization is reducing unnecessary development, and conservation of resources, especially when wastewater treatment capacity is available nearby.

In its discretion, the Commission has determined that there are four instances when it may approve a discharge permit application:

(1) There is no wastewater treatment facility or collection system within three miles of the proposed facility.

(2) The applicant requested service from wastewater treatment facilities within the 3 miles, and the request was denied.

(3) The applicant can successfully demonstrate that an exception to regionalization should be granted based on costs, affordable rates, and/or other relevant factors.

(4) The applicant has obtained a Certificate of Convenience and Necessity (CCN) for the service area of the proposed new facility or the proposed expansion of the existing facility.

2 AR 98 at AIRW000383.

It is undisputed that neither one nor four apply to this proceeding because the City has a wastewater treatment facility and collection system within three miles of the proposed package plant, (see 2 AR 87 at 9:30–10:1; 2 AR 134 at 17:4–8, 23:17–24:9, 25:4–17), and AIRW does not have a CCN for the service area proposed in the Application. 1 AR 66 at 7. It is undisputed that the City has sufficient capacity at Dove Springs WWTP to accept the volume of wastewater proposed in the Permit Application. AIRW's expert witness, Mr. Perkins, testified that, based on the record

13

"it appears [that the City] does have sufficient capacity at its Dove Springs WWTP to serve the proposed development." 2 AR 87 at 9:30–10:1; 2 AR 134 at 17:4–8, 23:17–24:9, 25:4–17.

It is also undisputed that the Commission has the discretionary authority to approve or deny a permit based on regional availability. AIRW Br. at 12, 17; Tex. Water Code § 26.0282. However, AIRW believes that, in the context of the Tex. Water Code, an "available" system is one that is "reasonably accessible to the applicant in the real world." AIRW Br. at 17-18. Apparently, the "real world" for AIRW is one where approvals are unconditional or waivers and variances from generally applicable requirements are offered by City staff (who have no authority to grant the same) without applicants having to apply for them. *Id.* As a result, the system is unavailable to AIRW if it requires any additional step to connect with their system.

AIRW contends that the City's system is unavailable because under Section 13.05 of the City's Unified Development Code, the City requires annexation to obtain wastewater services. 2 AR 165 342-343. On the contrary, there is sufficient capacity available at Dove Springs WWTP to take on AIRW's development. 2 AR 87 at 9:30–10:1; 2 AR 134 at 17:4–8, 23:13–24:9, 25:4–17; see generally 2 AR 152; 2 AR 150. The City merely requires an additional procedural step in the process of connecting to the City's system—a step that may be waived by the City Council upon request. 2 AR 165 at 74-75. What is more, the cost to connect to the existing system is less than the cost to construct the proposed package plant. 2 AR 91; 2 AR 92. TCEQ

14

even notes that regionalization typically costs less than constructing, operating, and maintaining a new stand-alone system. 2 AR 99 at AIRW000392-393.

Therefore, the substantial evidence in the administrative record indicates that there is available capacity at an existing WWTP, and it is unreasonable for the AIRW to argue otherwise.

### 1. The Georgetown City Council did not deny the service request of AIRW.

The District Court correctly held that the City Council did not deny the request to connect to its existing wastewater treatment facility. Final Judgment. The District Court also correctly notes that it was "unreasonable to assume" the limited conversations between AIRW and the City's staff members prove that the City Council had "spoken" on the matter. *Id.*

The Legislature vests TCEQ with broad discretion in determining whether to issue a discharge permit, regarding who must apply for such a permit and what a permit application looks like. Tex. Water Code § 26.027(a); 30 Tex. Admin. Code § 305.1 et seq.; *Texas Comm'n on Env't Quality v. Maverick Cnty.*, 642 S.W.3d 537 (Tex. 2022). As a result of this authority, the Commission has decided that it may approve a discharge permit application when an "applicant requested service from wastewater treatment facilities within the 3 miles, and the request was **denied**." 2 AR 98.

The record indicates that in 2019 600 Westinghouse Investments, LLC and 800 Westinghouse Investments, LLC (collectively, the "Developers") emailed the City Manager's office inquiring into whether they could connect the new development to the City's wastewater treatment system. 2.AR.100 at 1. A City staff member replied

with a recitation of the City's policy that "annexation is required" under the City's ordinances. *Id*.; *See* Georgetown Unified Dev. Code § 13.05. AIRW took the statement of policy and the required condition as a rejection to connect to the system. Because AIRW mistook this as a denial of service, it began considering how to build their own wastewater treatment plant for the development. AIRW Br. at 5; 2 AR 107. On the other hand, the TCEQ's position was that this conversation translated to an "effective denial of service." TCEQ Br. at 27, 29-30. Both interpretations are incorrect.

The conversation continued when the Developers approached the City a second time, where they inquired about opportunities to connect to the wastewater system without annexation or under a delayed annexation approach. AIRW Br. at 5–6. AIRW suggested that it could build a 5-acre park in place of the wastewater treatment facility, if the annexation could be delayed or waived. 2 AR 107 at 3. Despite this suggestion, the City's planning director again explained that annexation is required under the City's ordinances. 2 AR 107 at 3. The Developers again took this reiteration of policy as a denial of service. However, during early conversations between potential negotiating parties, attaching a prerequisite to the agreement more closely resembles a qualified approval, than an outright rejection. This is especially true considering that in this instance there are no other barriers to service: there is capacity available within the City's wastewater system and the development is within the City's ETJ.

Again, the Developers' position was that the above response was an outright denial of service, which closed the door entirely to the proposed request. AIRW Br.

16

at 6. However, the door was not entirely closed because the Developers attempted to revisit the conversation again a few months later. *Id.* The City was of the understanding that the discussion of connection, with the potential of delayed or waived annexation was still on going. Ms. Sofia Nelson, the City's Planning Director, even concluded her email conversation with the Developer by stating, "Please let me know if you would like to discuss further," (2 AR 74 at 00077) which invited further dialogue between the parties and not a denial of wastewater service.

The repeated attempts by the Developers to gain access to wastewater treatment services shows that negotiations were ongoing, and that none of the previous conversations amounted to a denial of service. If anything, attaching a prerequisite shows that City was willing and able to allow the connection, just not unconditionally. *See generally* 2 AR 150.

While none of the individual conversations between the Developer and the City equate to an outright denial of service, the accumulation of the conversations cannot even amount to an outright denial because the City Manager and other staff members do not have the authority to speak on behalf of the City. *See City of Denton v. Grim*, 694 S.W.3d 210, 215 (Tex. 2024). All conversations between the Developer and the City were between parties unable to unilaterally bind the City. 2 AR 142; 2 AR 102; 2 AR 101.

For example, the City's Planning Director, Ms. Sofia Nelson, has the power to **review but not approve** an annexation/disannexation request or a development agreement. 2 AR 9–11. She does not have any "Final Action Authority." *Id.* On the

other hand, the City Manager's Office, which runs the daily operations of the City and plays an advisory role for the City Council, is not even listed as an office that has a review, repeal, or "Final Action Authority." *Id.* Therefore, Assistant City Manager Wayne Reed serves as an advisor to the City Council, and carries out the decisions *of* the City Council, but does not make decisions *for* the City Council. *Id.* (showing that the Manager's Office does not have "Final Action Authority" under the UDC.).

To reach the determination that the City denied service, TCEQ only relied upon the email correspondence between City staff and AIRW that does no more than inform AIRW of a generally applicable annexation requirement. It is unreasonable for both AIRW and TCEQ to take the recitation of policy as a denial of service or waiver. Moreover, nothing in the administrative record indicates that AIRW ever attempted to seek a waiver from the City Council but instead took the statement of policy as a de facto rejection. Without so much as an attempt to formally introduce a Development Agreement to the City Council, it is impossible to know whether the City Council would or would not be willing to waive the annexation requirement. Final Judgment. Consequently, TCEQ's conclusion is unsupported by the evidence in the record and, therefore, arbitrary.

Under the UDC, the City Council is the official voice of the City in legislative and policy matters, including annexations and waivers. 2 AR 165 at 81–82. ("The annexation or disannexation shall become effective when approved by the City Council and in accordance with the City Charter."); 2 AR 165 at 75 ("The City Council shall hold a Public Hearing, [] and may take final action on the proposed Development

18

Agreement or amendment"); *see also* 2 AR 9–11.  As a result, only the City Council can bind the City in an annexation or waiver, not its staff members, City Manager, or a single council member. Final Judgment. *City of Austin v. Whittington*, 384 S.W.3d 766, 785 (Tex. 2012) (". . . the words of one city council member or city employee do not ordinarily bind the entire city council.").  Thus, the City had not officially spoken on whether it was willing to delay or waive the annexation requirement; rather other City' offices had reported out the City's ordinance on the matter.  Thus, it was correct for the District Court to hold that there was no way of knowing whether the City Council would delay or waive the requirement without going through the political process.

The TCEQ also argues that even if there was not a formal denial from the City Council, it is not even required.  TCEQ Br. at 31–33.  This argument is misplaced. The Commission is claiming that a "refusal does not require formalities," despite AIRW not asking those formally tasked with making the decision (i.e., the City Council).  TCEQ Br. at 31 (citing *Morath v. Lampasas Indep. Sch. Dist.,* 686 S.W.3d 725, 735 & n. 30 (Tex. 2024)).

Moreover, the Commission misapplies Texas Supreme Court precedent from *The Commons of Lake Houston, Ltd. v. City of Houston*.  TCEQ Br. at 31.  TCEQ contends that the City has lost sight of the fact that the approval under judicial review is the Commission's.  TCEQ Br. at 32.  The City does not dispute that the Commission's decision is the one under review.  The City's position is that *the City Council* had yet to make a final decision in the waiver of annexation (due to AIRW's

19

failure to seek this administrative remedy), which makes it unreasonable for the Commission to decide that service was denied—not that the issue is unripe for judicial review.

*The Commons of Lake Houston, Ltd. v. City of Houston* addresses a regulatory takings claim, where the Texas Supreme Court, in part, is discussing finality as it relates to ripeness for judicial review. *The Commons of Lake Houston, Ltd. v. City of Houston*, No. 23-0474 at *23. The Texas Supreme Court held that "for a regulatory takings claim to be ripe there must be a final [and authoritative determination] regarding the *application of the regulations* to the property at issue." *The Commons of Lake Houston, Ltd. v. City of Houston*, No. 23-0474 at *23 (quoting *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998)) (emphasis added). Otherwise, the *court* cannot reach its decision on whether the regulation went too far. *Id.* at 24 (quoting *Mayhew*, at 929).

The Texas Supreme Court held that the claim was ripe because, when obtaining a final determination, the property owner needs only to submit one application, and if denied, seek a variance. *Id.* In that case, the Commons had made a series of attempts to obtain a floodplain-development permit from the City. *Id.* at 25. Unlike the Commons, the Developers in the instant case made no attempt to formally apply for a Development Agreement or otherwise request an annexation waiver, and therefore, was not any closer to obtaining a final determination. AIRW Br. at 32. As noted by the Supreme Court, the "finality" bar is quite low, but not low enough to consider the Developers' conversations via email enough to constitute

20

finality to make the Commissioner's decision a reasonable one. *The Commons of Lake Houston, Ltd. v. City of Houston*, No. 23-0474 at \*23 ("The 'finality requirement is relatively modest.'"). Consequently, TCEQ's and AIRW's application of *The Commons of Lake Houston, Ltd.* misses the mark, and the TCEQ reached an unreasonable result.

### C. AIRW and the Commission misconstrue Texas's Regionalization Policy.

AIRW fundamentally misunderstands the regionalization policy. Contrary to AIRW's position, the regionalization policy was not drafted by the legislature to ensure serious consideration of nearby systems *by applicants* for wastewater permits. AIRW Br. at 16. Rather, the policy is a guidepost for the Commission to efficiently utilize existing wastewater infrastructure. 2 AR 99 at AIRW000392–393. Per the TCEQ policy statement, the goal of "regionalization is to provide timely and cost-effective solutions for achieving quality service." 2 AR 99 at AIRW000392–393. The policy also helps to conserve economic resources because regional systems can distribute costs over a larger customer base. *Id.*; 2 AR 99 at AIRW000390–391. Generally, this will result in lower treatment and disposal costs because "costs associated with compliance are higher per person as the system size decreases." 2 AR 99 at bates p. AIRW000392–393. Therefore, the policy is not an administrative or procedural check-the-box step in the permitting process for applicants; it is a policy of the state to ensure that TCEQ does not rubber-stamp new projects when there is sufficient existing infrastructure.

21

Moreover, the regionalization policy was not drafted to be leveraged by permit applicants or those in opposition thereof. The policy is in place to give the agency the confines to the broader infrastructure and water quality protection goals of the state and to effectuate them efficiently.

**D. The District Court properly applied the legal standards in reversing and remanding the Permit.**

The City Council cannot approve annexation, even delayed annexation, or a waiver thereof without following the appropriate political process. The City of Georgetown's Unified Development Code addresses the process for annexation in Section 3.25 and the process for a development agreement (i.e., the official political process to waive annexation) in Section 3.20. Both Sections 3.25 and 3.20 outline an identical process for the initiation, review, and approval of an application. Moreover, both processes specifically require the approval of the City Council. 2 AR 165 at 75, 82. Therefore, unless specifically authorized, individual officials, such as the city manager or development director, do not have unilateral authority to approve annexation or waiver because that job remains with the City Council.

It does not matter whether the staff was acting aligned or contrary to the wishes of the City Council; they simply do not have the authority to make the decisions for the City Council. Consequently, it was unreasonable for the Commission to infer the City Council's stance based on the city staff who interacted with the Developers. AIRW Br. at 31.

Further, while AIRW is correct that "the City's code contains no provision indicating 'unless waived'" in Section 3.25, it clearly fails to recognize that the City's

22

code is a comprehensive scheme that allows for a development agreement in place of the immediate annexation requirement. AIRW Br. at 25. AIRW also contends that the City of Georgetown's Unified Development Code does not explicitly reference annexation waivers or provide a process to pursue said waivers. *Id.* This is incorrect and has been clarified through this Brief. The City may waive annexation through Development Agreements, which are authorized under Tex. Loc. Gov't Code § 212.172. 2 AR 165 at 75. Indeed, the purpose of a Development Agreement is to "modify or delay certain requirements of [the] Code [ . . . ] and/or any other provisions of the City Code of Ordinances *in order to present an alternative plan for development that could not otherwise be accomplished under this Code or the Code of Ordinances.*" Sec. 3.20.010 (emphasis added). These agreements may include delayed annexation or full waivers. A development agreement may permit the City to modify or delay certain requirements of the Code in exchange for a compromise on development standards or land use controls.

Under Section 3.20.030, the City Council has the authority to approve and enter into Development Agreements. 2 AR 165 at 75. But before an agreement reaches the City Council for approval, there are a number of procedural steps required. 2 AR 165 at 74–75. This is because land use conflicts are seldom resolved though binary outcomes; rather, they are more often the product of negotiation and political processes. First, to initiate a Development Agreement a property owner or their authorized agent must make an application. *Id.* Then application must be reviewed by a Development Agreement Committee for completeness. 2 AR 165 at 75.

23

This Committee will also complete a more technical review of the application, and afterwards it will be published for the public. *Id.* Subsequently, the Planning and Zoning Commission will hold a Public Hearing and make a recommendation to the City Council. *Id.* The City Council then gets the final say in whether to approve the proposed Development Agreement *Id.; See Cent. Power & Light Co. v. City of San Juan*, 962 S.W.2d 602, 612 (Tex. App. 1998) ("It is a well-settled rule that the governing authorities of cities can express themselves and bind the cities only by acting together in a meeting duly assembled.").

In general, cities may only "express and bind themselves [] by way of a duly assembled meeting," *Grim* at 215 (quoting *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003)). There were no official assembled meetings between the City Council and the Developer because there was no formal application for annexation or a development agreement. There were only a few spread out email chains and phone calls. *See generally* 2 AR 101-103; 141–142. None of which individually or cumulatively can be considered a formal application for a waiver of the annexation requirement or any other modification to the City's requirements of service. If fact, no formal application for service was ever received by the City.

Moreover, the Texas Supreme Court has held that to assess a city's determinations, it must first "look [at] official materials such as orders, resolutions, and minutes." *Whittington* at 785. Because there were none available, it was also reasonable to for the District Court to conclude that the City had made no official determination. The Supreme Court explained its position on the matter by stating

24

that the "purpose in restricting [its] review to these materials is that the words of one city council member or city employee do not ordinarily bind the entire city council." *Id*. This reiterates the point. It would be extraordinary for the City Council to be bound by conversations of City employees, especially those that do not serve on the Council.

Thus, it was unreasonable for the Commission to attempt to "hold the city to the terms of its own law" when there very clearly is a process to waive the requirements of that law. AIRW Br. at 26-27. The City would not need to "set aside its own law" because there is already a process to obtain a waiver from the law. *Id*. Consequently, the District Court correctly noted that "there is no way to know whether the city council would be willing to waive the annexation requirement." Final Judgment. Instead, the District Court's Order was a call to follow the required political process and ask those with the power to bind the City. The District Court does not require that the development obtain services from the City. It requires that the development subject itself to the minimum political process before unilaterally deciding that service would be denied.

### E. The Commission's misapplied its own rules in considering hypothetical loss in value.

AIRW claims that using the City's wastewater services would "cost" the new residential development "tens of millions of dollars," primarily by lowering the Development's value by $20 million. AIRW's Br. at 1. Not only is a hypothetical loss in value not a "cost" in the general sense of the word, but it is also a wholly improper metric for evaluating the cost of connection. Further, nothing in the relevant laws,

25

regulations, or instructions permits TCEQ to take such a broad approach to quantifying the cost of connection in comparison to the cost to build new infrastructure.

Reduction in value is a loss of potential profit; cost is a real expenditure. Thus, the Commission was incorrect to claim that "costs weigh in favor of granting the AIRW application" when it considered reduction in property value sufficient to tip the scales in favor of granting the Permit. 1 AR 66 at 11; TCEQ Br. at 26. Specifically, in reaching its decision, TCEQ attempts to reframe *reduction in value* as an "economic cost," to cover up its misguided cost analysis. TCEQ Br. at 33. TCEQ supports this error by pointing to AIRW's testimony, which called the difference between the cost to connect and the cost to build a new plant a "great disparity." TCEQ Br. at 34. However, the administrative record indicates that connection would actually cost about $284,075 less, including unneeded easement acquisition costs, than constructing a new stand-alone wastewater package plant. 2 AR 151; 2 AR 134 GT PFT 000096–98; Cf. 2 AR 91–92. In fact, both sides' experts agreed that it was more expensive to construct a new wastewater package than making the needed improvements to connect to the City's existing wastewater treatment system. 2 AR 151; 2 AR 91.

It is undisputed that the Commission has the discretion under the regionalization policy to consider cost, but reduction in value is not a cost. If the Commission had only considered cost, it would have found that the evidence weighed in favor of denying the Permit because it cost less to connect to the existing system

26

(which is one of the reasons why the regionalization policy exists in the first place). Thus, the Commission reached an unreasonable result, that was contrary to the evidence in the administrative record.

AIRW contends that the record supports the notion that connecting to the City's wastewater system would *reduce the development's value* by $20 million. AIRW Br. at 23–24. AIRW reached this conclusion based on the taxes, fees, and other costs to comply with the City's requirements (i.e., annexation). *Id.; Cf. 2 AR 91.* This reduction in value may very well be an established hypothetical loss of future profit, but that does not change the TCEQ's requirement to consider "costs," (expenditures) which is the proper metric for evaluating the cost of connection.

Jonah argues that neither the statutes nor guidance provide any specificity into what evidence is necessary to demonstrate when "an exception to the Regionalization Policy should be granted based on costs." Jonah Br. at 26–27. This is because Jonah ignores that the TCQC has determined what should not be considered in its decision-making process. *See* Tex. Tex. Nat. Res. Conservation Comm'n, Executive Director's Response to Public Comments Concerning Application by City of Shamrock MSW Permit No. 2281, Docket No. 2001-0702-MSW at 13–14 (May 11, 2001). Further, Jonah contends that because TCEQ has not denied any wastewater permit actions based solely on regionalization, it shows that it has exercised discretion in determining whether to issue a TPDES permit. Jonah Br. at 27. However, the mere fact that TCEQ has not previously denied a permit based on regionalization does not preclude it from doing so, nor does it obviate their need to

27

correctly apply the regionalization mandate consistent with the law. Tex. Water Code §§ 26.0282; 26.081; 2 AR 98.

When reviewing a permit application, the Commission can consider several factors related to public health and environmental protection, as defined by state law and regulations. Tex. Water Code § 26.003. These factors include environmental impacts, technical standards, compliance history, public comments, among others. Sec. 26.028–26.0282. Despite these broad considerations, the TCEQ's authority remains limited to issues inside of their jurisdiction. Concerns Outside of TCEQ's Authority, available at: https://www.tceq.texas.gov/agency/decisions/participation /permitting-participation/concerns-outside-of-tceqs-authority. For example, as set by the Legislature, the TCEQ's website states what it may consider when reviewing a permit application. This website shows that TCEQ's position is that it does not have the authority to consider (1) noise, **(2) zoning, (3) effects on property values,** (4) light pollution, (5) increased traffic, (6) effects on local economy, or (7) historic sites when reviewing a permit application. *Id.* Moreover, "When property value issues have been raised in a hearing request, the Commission has not referred the issue for contested hearing, based on their lack of statutory authority to do so." *See Tex. Nat. Res. Conservation Comm'n*, Executive Director's Response to Public Comments Concerning Application by City of Shamrock MSW Permit No. 2281, Docket No. 2001-0702-MSW at 13–14 (May 11, 2001); *Tex. Nat. Res. Conservation Comm'n*, Executive Director's Response to Hearing Requests, Hereford MSW Permit No. MSW 2289, Docket No. 2002-0653-MSW at 12 (June 3, 2002).; *Tex. Nat. Res. Conservation*

28

*Comm'n*, Interim Order Concerning Application by the Applerock Group, LLC for Municipal Solid Waste Permit No. 2276, Docket No. 2001-0681-MSW (Sept. 14, 2001); *Tex. Nat. Res. Conservation Comm'n*, Interim Order Concerning City of Hereford MSW Permit No. MSW-2289, Docket No. 2002-0653-MSW (June 28, 2002).

As a result, TCEQ's consideration of the alleged reduction in property values because of rezoning under the guise "connection costs" is misguided and squarely outside its jurisdiction. Moreover, Jonah's contention that "Texas' Regionalization Policy does not limit what costs the Commission can consider," is also inconsistent with its jurisdictional constraints. Jonah Br. at 29. It is true that "the *statute* does not limit the Commission's discretion to consider the cost impacts of the City's annexation requirements and development regulations," but its guidance and broader statutory requirements do. 2 AR 99.

It is undisputed that after the comparison the various discharge options and their respective costs, it is less costly to connect to the City's existing facilities than to construct the proposed package plant, and contrary to this evidence in the administrative record, TCEQ concluded that costs weigh in favor of granting the Application. Thus, TCEQ acted arbitrarily because it considered an irrelevant factor, explicitly outside of its jurisdiction.

### F. Whether the wastewater treatment service is within the City's ETJ or another's service area does not affect the Commission's defective regionalization analysis.

As noted above, the new Development is within the City's ETJ (outside the City's corporate limits). 1 AR 66; 2 AR 161. Contrary to the arguments of AIRW and

29

Jonah, the location of the Development does not affect the City's ability to serve it with wastewater services. *See* Jonah Br. at 31–33; AIRW Br. at 33–34; 2 AR 159. This is because not only is there a wastewater service connection within three miles of the Development, but there are also no other legal barriers in the CCN statutes or PUC rules preventing the City from providing wastewater service to proposed service area.

It is also undisputed that the City is a retail public utility under the Tex. Water Code and Commission's rules. Jonah Br. at 32 . The City is able to serve the Development with wastewater services like it does for thousands of other Texans. The only procedural step for the City (because of its retail public utility status) to complete is to provide the PUC with evidence that it received the required consent to provide wastewater services within Jonah's district boundaries. Tex. Water Code § 13.244(c); 16 Tex. Admin. Code § 24.225(c). Moreover, at the time of the May 2022 hearing, Jonah did not provide *any* wastewater treatment services whatsoever. 4 AR 180 at 253:7–14. Therefore, this is not a matter of a physically remote and infeasible connection process, but of a future procedural step that may be required. Furthermore, this procedural step is not a requirement under the Regionalization analysis, nor is it required to occur prior to the Commission reaching a decision to issue a discharge permit.

### G. TCEQ erred in concluding the Permit is protective of water quality and the existing uses of the receiving waters.

The evidence in the administrative record does not support the Commission's finding that the Permit is protective of water quality and the existing uses of the

receiving waters in accordance with applicable TSWQS, including protection of aquatic and terrestrial wildlife. Although there is a legal presumption that a TPDES permit issued by the Commission complies with all state and federal requirements, the evidence demonstrates that the Draft Permit violates several of these requirements, each of which are discussed below. *See* Tex. Gov't Code § 2003.047(i-1); Tex. Gov't Code § 2003.047(i-2).

The Legislature granted the TCEQ the authority to administer Texas' wastewater permitting program. Tex. Water Code § 26.027. Pursuant to this authority, TCEQ promulgated the Texas Surface Water Quality Standards ("TSWQS"), which established the criteria for protecting waters of the state. 30 Tex. Admin. Code Ch. 307. Under the TSWQS, the policy of the state is:

> maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, and the operation of existing industries, taking into consideration the economic development of the state; to encourage and promote the development and use of regional and areawide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state; and to require the use of all reasonable methods to implement this policy.

Tex. Water Code § 26.003; 30 Tex. Admin. Code 307.1.

In addition to the regionalization policy, TCEQ undertakes a "technical review" before issuing a permit for wastewater discharge or other authorized discharges to the surface waters of the state which considers general standards, narrative standards, segment specific numeric standards, numeric standards for toxic substances, and an "antidegradation review." 30 Tex. Admin. Code § 307.4–5. If

31

sufficiently protective of the waters of the state, the Commission will issue the resulting permit under the TPDES program.  2 AR 129 at bates p. 0028.

TCEQ alleges the City "did not provide credible evidence that the draft permit does not comply with [TSWQS]." TCEQ Br. at 42.  Meanwhile, AIRW alleges that the City "failed to introduce any evidence that effluent from the Facility will not maintain or protect existing uses."  AIRW's Br. at 36–39.  Neither is the case.  *See* e.g., 2 AR 134.

TCEQ attempts to argue that because the Application, the Draft Permit, and other materials were admitted into record at the preliminary hearing, that the evidentiary burden is automatically met.  TCEQ Br. at 41.  This improperly suggests *any* data is sufficient data to grant a permit.

## H. TCEQ adopted a permit that is noncompliant with its antidegradation policy and procedures.

Issuing this Permit to AIRW was an abuse of discretion by TCEQ because the administrative record provides no reasonable support that the Permit complied with the antidegradation policy and procedures.  It is undisputed that the Commission staff member Jenna Leug completed an antidegradation review for the Development's Permit. TCEQ Br. at 43–44.  However, the City's position remains that the failure to collect and review the appropriate data results in a materially deficient antidegradation review process.

When a new permit will increase pollution into water of the state, the TCEQ's technical review includes an "antidegradation review" to further ensure that the water quality will be maintained in accordance with 30 Tex. Admin. Code Ch. 307

32

and TSWQS. *See* 2 AR 129 at bates p. 071. TCEQ defines degradation as the as the lowering of water quality by more than a de minimis extent but not to the extent that the existing use is impaired. 30 Tex. Admin. Code § 307.5(b)(2). When conducting its antidegradation review, the TCEQ considers "multiple water-quality parameters to determine whether the discharge will cause an overall lowering of water quality." *Save Our Springs* at *2. This approach includes consideration of both numeric (quantitative) and narrative (qualitative) metrics of the receiving water body. *Id*. at 4–5. Although, there are some parameters that are only subject to the general narrative criteria. *Id*. at 5. The Texas Supreme Court recently held that the "TCEQ's practice of assessing a water body's overall quality" via numeric and narrative standards conforms to the current regulatory requirements. *Id*.

The Commission is guided by the Water Quality Division, Procedures to Implement the Texas Surface Water Quality Standards ("IPs") when conducting the water quality analysis. *See* 2 AR 129; *see also* Tex. Water Code § 26.023 ("The commission by rule shall set water quality standards for the water in the state . . . [and] has the sole and exclusive authority to set water quality standards for all water in the state." The IPs "provide methods for individually evaluating [the water quality] components"—a "process is consistent with TCEQ's whole-body approach." *Save Our Springs* at *23 (citing 2 AR 129 at 071–085).

The Commission's rules outline the antidegradation standards for permitted discharges into a tiered system that includes three tiers of waterways. 30 Tex. Admin. Code § 307.5(a)-(b). Under Tier 1, reviews require only that "water quality is

33

sufficiently maintained so that existing uses are protected" and applies to any pollutant that will impair water quality." 30 Tex. Admin. Code § 307.5(c)(2)(A). Tier 2 is for fishable and swimmable waters of the state. 30 Tex. Admin. Code § 307.5(c)(2)(B). No regulated activities that would cause degradation of waters of the state are allowed in Tier 2 (unless it is necessary for an important economic or social development). 30 Tex. Admin. Code § 307.5(b)(2). Tier 3 is reserved for "outstanding national resource waters." 30 Tex. Admin. Code § 307.5(b)(3). The Tier 1 and 2 "antidegradation standards differ but materially overlap" because they bother require that water quality and the existing uses are maintained to protect such uses. *Save Our Springs* at \*19 (citing 30 Tex. Admin. Code 307.5(b); § 307.3(27) (defining "existing uses")).

Therefore, under these standards, TCEQ may only issue a discharge permit to AIRW if it determines that the permitted activities are not going to disturb existing uses or impermissibly degrade water quality. *See Save Our Springs*. TCEQ did not.

TCEQ maintains that the Permit "does not violate the Commission's antidegradation policy." TCEQ Br. at 43. Yet the administrative record indicates that the Commission failed to conduct the appropriate inquiry into the uses and criteria for the receiving water or evaluate the impact on water quality from the proposed activity. *See*, e.g., 2 AR 129 at 0034, 0036.

TCEQ claims that the Permit satisfies the Tier 1 requirements, even though Jenna Lueg failed to consider the codified narrative standard for the protection of aesthetic values (30 Tex. Admin. Code § 307.4(b), 4 AR 181 at 695:11–14), and that

34

she admitted to not always considering what land uses will be around the receiving water body. 4 AR 181 at 696:3–4. Even as the TCEQ's key witness, Ms. Lueg's supporting documentation is devoid of any mention of narrative standards; criteria protective of livestock watering, irrigation, or terrestrial wildlife; and an evaluation of aquatic life resident in the downgradient stream to which treated wastewater would eventually flow. 2 AR 73 at bates pp. 0042–0043. Because TCEQ's failed to develop information about existing uses, it is impossible for the record to support a finding that existing uses will be maintained. Thus, TCEQ failed to establish that the Permit complies with the antidegradation policy of the TSWQS.

## I. The AIRW Permit is in violation of applicable requirements regarding nuisance odors.

AIRW and TCEQ incorrectly claim that the Permit complies with the applicable nuisance odor requirements and with Tex. Water Code § 26.030(b). 1 AR 49 at 16–18; 1 AR 50 at 5–6.

Under 30 Tex. Admin. Code § 309.13, a wastewater treatment plant must comply with site specific location conditions to abate their potential to generate noxious odors. Thus, if the location conditions are met, a new wastewater treatment plant will be situated in a "suitable" site. At present, the Permit issued to AIRW would result in a wastewater treatment plant that is situated in an unsuitable location.

The minimum location standards for a domestic wastewater treatment facility are found in Title 30 Tex. Admin. Code Chapter 309, Subchapter B and are used by the Commission in the "evaluation of an application for a permit to treat and dispose

35

of domestic wastewater." 30 Tex. Admin. Code § 309.10(a). Under this standard, the Commission must condition the issuance of a permit for the new domestic wastewater treatment facility on selection of a site that minimizes the possibility of exposing the public to nuisance conditions or contamination of water in the state. 30 Tex. Admin. Code § 309.10(b). The Commission provides three options for applicants to satisfy the nuisance odor abatement and control requirements: (1) own the buffer zone area, (2) obtain a restrictive easement from the adjacent property owner for any part of the buffer zone not currently owned by the Applicant, or (3) prepare a nuisance odor control plan. *Id.*

According to the record, AIRW intends to comply with the nuisance odor requirements by owning the area of the buffer zone. Administrative Report 1.1, Section 3.B. TCEQ contends that AIRW's Application establishes ownership of a 150-foot buffer zone based on the map of the property attached to the Application. TCEQ Br. at 49. The Commission attempts to bolster this evidence by pointing to Mark Perkins' testimony. TCEQ Br. at 50. However, neither the map nor testimony overcame the fact that the 150ft buffer zone is not met.

The Permit only temporarily meets the buffer requirements because the TCEQ is ignoring the upcoming realignment of County Road 111, which will result in the loss of the buffer zone (i.e., there will no longer be a road buffering the Proposed Package Plant from the Patterson Ranch subdivision). 4 AR 180 at 453; see generally 2 AR 89. If the TCEQ had properly considered the evidence in the record, it would have found that AIRW will be unable to comply with 30 Tex. Admin. Code § 309.13(e)

36

because of the county road realignment and resulting reduction of road buffer. The TCEQ failed to consider a crucial piece of evidence, one that would result in AIRW failing to meet the statutory requirements, and thus, acted arbitrarily.

Beyond the nuisance odor requirements, Tex. Water Code § 26.030(b) mandates that the Commission "consider any unpleasant qualities of the effluent, including unpleasant odor, any possible adverse effects that the discharge of the effluent might have on the *recreational value of the park,* playground, or schoolyard." (emphasis added). It is undisputed that the Permit's proposed discharge route travels through a residential development and an attendant open "greenspace." 2 AR 139. But TCEQ argues that because the evidence shows that the discharge will not go into any body of water that crosses or abuts any park, playground, or school yard within one mile of the discharge Tex. Water Code § 26.030(b) is being appropriately followed. TCEQ Br. at 50–51. That is not the statutory requirement. Tex. Water Code § 26.030(b) mandates that the Commission consider the effects on the recreational value of a park but does not limit the definition of park to areas denominated as such by a governmental entity, thereby excluding passive recreational green spaces attendant to residential developments such as the Patterson Ranch greenspace immediately downstream of the proposed point of discharge.

Nothing in the record supports TCEQ's claim that it even considered possible adverse effects of the discharge because it dismissed the actual uses of the land within the discharge route. Therefore, TCEQ acted arbitrarily because there is insufficient evidence to conclude that the Application complies with Tex. Water Code § 26.030(b).

37

**J. The Permit does not protect human health or provide for sufficient operational requirements.**

TCEQ maintains that the Permit is protective of human health and the nearby residents, despite failing to include conditions to require more frequent monitoring and other operational requirements to prevent the discharge of partially treated or wholly untreated wastewater during operational disruptions (which invariably occur at wastewater treatment facilities) given the nature of the discharge route. TCEQ Br. at 51. Had the Commission conducted this analysis, it would have discovered the potential risk of exposure to pathogens (including enteric viruses and E. coli) in partially treated or untreated wastewater and would have included conditions to prevent or mitigate such exposure, which could then reasonably support the agency's contention that the Permit is protective of human health. Without this information and such permit conditions , it is unreasonable for TCEQ to maintain that its issued Permit protects the nearby residents considering the proximity of the point of discharge to the adjacent Patterson Ranch residential subdivision. Therefore, TCEQ abused its discretion when it concluded that the Permit is protective of the health of the nearby residents without collecting the data that would support that conclusion. Moreover, TCEQ failed to include measures to ensure that inadequately treated wastewater will not be discharged to the receiving stream (which consists entirely of untreated wastewater and flows directly through a residential neighborhood). The Permit will not be protective of human health without the operational controls to ensure improperly treated wastewater.

**K. The Permit Application was not substantially complete and accurate.**

AIRW maintains that the Permit Application was complete and accurate, but the record proves otherwise. AIRW Br. at 34; *See* 1 AR 49 at 19–25; 1 AR 50 at 6. During the application review process, the City identified multiple incomplete and inaccurate responses, which should have justified an application denial. 1 AR 51 at 59–72. Because the Application was insufficient, TCEQ was prevented from conducting a full permit analysis, and, as a result, issued a permit unsupported by the evidence.

Under Tex. Water Code § 26.027(b), permit applicants must submit an application that contains *all information* reasonably required by the Commission. Tex. Water Code § 26.027(b) (emphasis added). Upon receipt and prior to reviewing the substance of the application permit, TCEQ staff must first ensure the application is administratively complete (i.e., contains all required information). *See* 30 Tex. Admin. Code § 39.418. The Commission will not move forward with a technical review of a permit application if it is incomplete. *Id*.

Not only did the Commission improperly move forward with the technical review, AIRW freely admits that it failed to list 600 Westinghouse Investments, a co-owner of the facility, and Jonah Water, the operator of the system, on the Permit Application. AIRW Br. at 35. AIRW contends that because it owns the property where the wastewater treatment facility would be built, it is the only party that must be listed. *Id*. That is not what Tex. Water Code § 26.027(b) asks of an applicant. Rather, it seeks *all information* reasonably required by the Commission. Yet AIRW

39

unilaterally decided what information it determined was required for the Commission to be privy to.

## PRAYER

The Application and the Permit fail to comply with the relevant provisions of Texas law and TCEQ rules. As such, the Application should have been denied, and the Court should uphold the District Court's decision to remand the Application to TCEQ.

Respectfully submitted,

SPENCER FANE, LLP
816 Congress Avenue, Suite 1200
Austin, TX 78701
Telephone:    (512) 840-4550
Facsimile:    (512) 840-4551

William A. Faulk, III
State Bar No. 24075674
cfaulk@spencerfane.com
Carlota Hopinks-Baul
State Bar No. 24094039
chbaul@spencerfane.com
Kelsey E. Parker
State Bar No. 24143891
kparker@spencerfane.com


**ATTORNEYS FOR APPELLEE, CITY OF GEORGETOWN, TEXAS**



**CERTIFICATE OF COMPLIANCE**

Based on a word count run in Microsoft Word, this reply brief contains 10,426 words, excluding the portions of the brief exempt from the word count under Texas Rules of Appellate Procedure 9.4(i)(2)(B).

William A. Faulk, III

**CERTIFICATE OF SERVICE**

I hereby certify that I have served or will serve a true and correct copy of the foregoing document via hand delivery, facsimile, electronic mail, overnight mail, U.S. mail, or Certified Mail Return Receipt Requested on all parties on this 21st day of July, 2025:


**Defendant-Appellant:**
**Texas Commission on Environmental Quality**
Evan Greene
Assistant Solicitor General
Evan.Greene@oag.texas.gov
Sara J. Ferris
Assistant Attorney General
Sara.Ferris@oag.texas.gov
OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Telephone: (512) 463-2012
Fax: (512) 320-0911


**Intervenor Defendants-Appellants:**
**AIRW 2017-7, L.P.; 600 Westinghouse Investments, LLC; and 800 Westinghouse Investments, LLC**
Andrew Davis
Andrew@lkcfirm.com
William T. Thompson
will@lkcfirm.com
Todd Disher
todd@lkcfirm.com
Michael C. Cotton
michael@lkcfirm.com
LEHOTSKY KELLER COHN, LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
Telephone: 512-693-8350

Helen S. Gilbert
hgilbert@bartonbensonjones.com
BARTON BENSON JONES, PLLC
7000 North MoPac Expressway, Suite 200
Austin, Texas 78731

Edmond McCarthy
Ed@ermlawfirm.com
MCCARTHY & MCCARTHY, LLP
122 Colorado St. Suite 2399
Austin, TX 78701


**Intervenor-Defendant / Appellant**
**Jonah Water Special Utility District:**
John J. Carlton
john@carltonlawaustin.com
Kelli A. N. Carlton
kelli@carltonlawaustin.com
Erin R. Selvera
erin@carltonlawaustin.com
THE CARLTON LAW FIRM, P.L.L.C.
4301 Westbank Drive, Suite B-130
Austin, TX 78746

William A. Faulk, III

**APPENDIX TO BRIEF OF APPELLEE CITY OF GEORGETOWN, TEXAS**

| Appendix Item | Description |
|---|---|
| 1 | **Texas Government Code Provisions** |
| | • Tex. Gov't Code Ann. § 2001.171 |
| | • Tex. Gov't Code §§ 2001.001 |
| 2 | **Texas Local Government Code Provisions** |
| | • Tex. Loc. Gov't Code § 212.172 |
| 3 | **Texas Water Code Provisions** |
| | • Tex. Water Code § 26.023 |
| 4 | **Texas Administrative Code Provisions** |
| | • 30 Tex. Admin. Code § 39.418 |
| | • 30 Tex. Admin. Code § 305.1 |
| | • 30 Tex. Admin. Code § 309.10(a) |
| 5 | **TCEQ Webpage "Concerns Outside of TCEQ's Authority"[1]** |

---

[1] https://www.tceq.texas.gov/agency/decisions/participation/permitting-participation/concerns-outside-of-tceqs-authority

# APPENDIX 1

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter G. Contested Cases: Judicial Review (Refs & Annos)

V.T.C.A., Government Code § 2001.171

§ 2001.171. Judicial Review

Currentness

A person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter.

**Credits**

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

Notes of Decisions (361)

**O'CONNOR'S CROSS REFERENCES**

See also *O'Connor's Texas COA*, "Administrative remedies," ch. 24-A, §2.8.

V. T. C. A., Government Code § 2001.171, TX GOVT § 2001.171

Current through legislation effective June 20, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

V.T.C.A., Government Code § 2001.001

§ 2001.001. Purpose

Currentness

It is the public policy of the state through this chapter to:

(1) provide minimum standards of uniform practice and procedure for state agencies;

(2) provide for public participation in the rulemaking process; and

(3) restate the law of judicial review of state agency action.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993.

**Editors' Notes**

**REVISOR'S NOTE**

**2016 Main Volume**

The revised law omits the portion of the source law that states that a purpose of the act is to "provide adequate and proper public notice of proposed agency rules and agency actions through publication of a state register." The omitted provision refers to the Texas Register. The provisions of the source law that relate primarily to the Texas Register have been separately codified in Chapter 2002 of this code.

Notes of Decisions (15)

V. T. C. A., Government Code § 2001.001, TX GOVT § 2001.001
Current through legislation effective June 20, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 2

KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
      Subtitle A. Municipal Regulatory Authority
        Chapter 212. Municipal Regulation of Subdivisions and Property Development (Refs & Annos)
          Subchapter G. Agreement Governing Certain Land in a Municipality's Extraterritorial Jurisdiction (Refs & Annos)

V.T.C.A., Local Government Code § 212.172

§ 212.172. Development Agreement

Currentness

(a) In this subchapter:

(1) "Adjudication" of a claim means the bringing of a civil suit and prosecution to final judgment in county or state court and includes the bringing of an authorized arbitration proceeding and prosecution to final resolution in accordance with any mandatory procedures established in the contract agreement for the arbitration proceedings.

(2) "Contract" means a contract for a development agreement authorized by this subchapter.

(3) "Extraterritorial jurisdiction" means a municipality's extraterritorial jurisdiction as determined under Chapter 42.

(b) The governing body of a municipality may make a written contract with an owner of land that is located in the extraterritorial jurisdiction of the municipality to:

(1) guarantee the continuation of the extraterritorial status of the land and its immunity from annexation by the municipality;

(2) extend the municipality's planning authority over the land by providing for a development plan to be prepared by the landowner and approved by the municipality under which certain general uses and development of the land are authorized;

(3) authorize enforcement by the municipality of certain municipal land use and development regulations in the same manner the regulations are enforced within the municipality's boundaries;

(4) authorize enforcement by the municipality of land use and development regulations other than those that apply within the municipality's boundaries, as may be agreed to by the landowner and the municipality;

(5) provide for infrastructure for the land, including:

    (A) streets and roads;

    (B) street and road drainage;

    (C) land drainage; and

    (D) water, wastewater, and other utility systems;

(6) authorize enforcement of environmental regulations;

(7) provide for the annexation of the land as a whole or in parts and to provide for the terms of annexation, if annexation is agreed to by the parties;

(8) specify the uses and development of the land before and after annexation, if annexation is agreed to by the parties; or

(9) include other lawful terms and considerations the parties consider appropriate.

(b-1) At the time a municipality makes an offer to a landowner to enter into an agreement under this subchapter, the municipality must provide the landowner with a written disclosure that includes:

(1) a statement that the landowner is not required to enter into the agreement;

(2) the authority under which the municipality may annex the land with references to relevant law;

(3) a plain-language description of the annexation procedures applicable to the land;

(4) whether the procedures require the landowner's consent; and

(5) a statement regarding the municipality's waiver of immunity to suit.

(b-2) An agreement for which a disclosure is not provided in accordance with Subsection (b-1) is void.

(c) A contract must:

(1) be in writing;

(2) contain an adequate legal description of the land;

(3) be approved by the governing body of the municipality and the landowner; and

(4) be recorded in the real property records of each county in which any part of the land that is subject to the contract is located.

(d) The total duration of the contract and any successive renewals or extensions may not exceed 45 years.

(e) A municipality in an affected county, as defined by Section 16.341, Water Code, may not enter into a contract that is inconsistent with the model rules adopted under Section 16.343, Water Code.

(f) The contract between the governing body of the municipality and the landowner is binding on the municipality and the landowner and on their respective successors and assigns for the term of the contract. The contract is not binding on, and does not create any encumbrance to title as to, any end-buyer of a fully developed and improved lot within the development, except for land use and development regulations that may apply to a specific lot. Annexation by a municipality of land subject to a contract does not invalidate the enforceability of the contract or infringe on the rights of a party to adjudicate a claim arising under the contract.

(g) A contract:

(1) constitutes a permit under Chapter 245; and

(2) is a program authorized by the legislature under Section 52-a, Article III, Texas Constitution.

(h) A contract between a municipality and a landowner entered into prior to the effective date of this section, or any amendment to this section, and that complies with this section is validated, enforceable, and may be adjudicated subject to the terms and conditions of this subchapter, as amended.

(i) A municipality that enters into a contract waives immunity from suit for the purpose of adjudicating a claim for breach of the contract.

(j) Except as provided by Subsection (k), actual damages, specific performance, or injunctive relief may be granted in an adjudication brought against a municipality for breach of a contract. The total amount of money awarded in an adjudication brought against a municipality for breach of a contract is limited to the following:

(1) the balance due and owed by the municipality under the contract as it may have been amended;

(2) any amount owed by the landowner as a result of the municipality's failure to perform under the contract, including compensation for the increased cost of infrastructure as a result of delays or accelerations caused by the municipality;

(3) reasonable attorney's fees; and

(4) interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

(k) Damages awarded in an adjudication brought against a municipality for breach of a contract may not include:

(1) consequential damages, except as expressly allowed under Subsection (j)(2); or

(2) exemplary damages.

**Credits**

Added by Acts 2003, 78th Leg., ch. 522, § 1, eff. June 20, 2003. Amended by Acts 2011, 82nd Leg., ch. 281 (H.B. 1643), § 1, eff. June 17, 2011; Acts 2021, 87th Leg., ch. 103 (S.B. 1338), § 2, eff. Sept. 1, 2021; Acts 2021, 87th Leg., ch. 678 (H.B. 1929), § 1, eff. Sept. 1, 2021.

V. T. C. A., Local Government Code § 212.172, TX LOCAL GOVT § 212.172

Current through legislation effective June 20, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 3


KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
 Water Code (Refs & Annos)
  Title 2. Water Administration (Refs & Annos)
   Subtitle D. Water Quality Control
    Chapter 26. Water Quality Control (Refs & Annos)
     Subchapter B. General Powers and Duties

V.T.C.A., Water Code § 26.023

§ 26.023. Water Quality Standards

Currentness

The commission by rule shall set water quality standards for the water in the state and may amend the standards from time to time. The commission has the sole and exclusive authority to set water quality standards for all water in the state. The commission shall consider the existence and effects of nonpoint source pollution, toxic materials, and nutrient loading in developing water quality standards and related waste load models for water quality. The commission shall develop standards based on all quality assured data obtained by the commission, including the local watershed and river basin database described by Section 26.0135(c)(2). In this section, "quality assured data" has the meaning assigned by Section 26.0135(i).

**Credits**

Added by Acts 1977, 65th Leg., p. 2207, ch. 870, § 1, eff. Sept. 1, 1977. Amended by Acts 1985, 69th Leg., ch. 795, § 1.072, eff. Sept. 1, 1985; Acts 1991, 72nd Leg., ch. 294, § 3, eff. June 7, 1991; Acts 1997, 75th Leg., ch. 101, § 3, eff. Sept. 1, 1997.

Notes of Decisions (2)

V. T. C. A., Water Code § 26.023, TX WATER § 26.023
Current through legislation effective June 20, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 4

Texas Administrative Code
   Title 30. Environmental Quality
      Part 1. Texas Commission on Environmental Quality
         Chapter 39. Public Notice
            Subchapter H. Applicability and General Provisions

30 TAC § 39.418

§ 39.418. Notice of Receipt of Application and Intent to Obtain Permit

Currentness

(a) When the executive director determines that an application is administratively complete, the Office of the Chief Clerk (chief clerk) shall mail this determination concurrently with the Notice of Receipt of Application and Intent to Obtain Permit to the applicant.

(b) Not later than 30 days after the executive director declares an application administratively complete:

    (1) the applicant, other than applicants for air quality permits, shall publish Notice of Receipt of Application and Intent to Obtain Permit once under §39.405(f)(1) of this title (relating to General Notice Provisions) and, for solid waste applications and injection well applications, also under §39.405(f)(2) of this title. The applicant shall also publish the notice under §39.426 of this title (relating to Alternative Language Requirements), if applicable;

    (2) the chief clerk shall mail Notice of Receipt of Application and Intent to Obtain Permit to those listed in §39.413 of this title (relating to Mailed Notice), and to:

        (A) the state senator and representative who represent the general area in which the facility is located or proposed to be located; and

        (B) the river authority in which the facility is located or proposed to be located if the application is under Texas Water Code, Chapter 26; and

    (3) the notice must include the applicable information required by §39.411(b) of this title (relating to Text of Public Notice).

(c) For air quality permit applications, except applications for plant-wide applicability limit permits under Chapter 116, Subchapter C of this title (relating to Plant-Wide Applicability Limits), the applicant shall provide notice as specified in Subchapter K of this chapter (relating to Public Notice of Air Quality Permit Applications). Specifically, publication in the newspaper must follow the requirements under §39.603 of this title (relating to Newspaper Notice), sign posting must follow the requirements under §39.604 of this title (relating to Sign-Posting), and the chief clerk shall mail notice according to §39.602 of this title (relating to Mailed Notice). The applicant shall also follow the requirements, as applicable, under §39.426 of this title.

**Credits**

**Source:** The provisions of this §39.418 adopted to be effective September 23, 1999, 24 TexReg 8190; amended to be effective November 30, 2005, 30 TexReg 7877; amended to be effective June 24, 2010, 35 TexReg 5198; amended to be effective September 16, 2021, 46 TexReg 5784.

Current through 50 Tex.Reg. No. 3702, dated June 20, 2025, as effective on or before June 27, 2025. Some sections may be more current. See credits for details.

30 TAC § 39.418, 30 TX ADC § 39.418

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 305. Consolidated Permits
        Subchapter A. General Provisions

30 TAC § 305.1

§ 305.1. Scope and Applicability

Currentness

(a) The provisions of this chapter set the standards and requirements for applications, permits, and actions by the commission to carry out the responsibilities for management of waste disposal activities under Texas Water Code, Chapters 26-28 and 32, and Texas Health and Safety Code, Chapters 361 and 401.

(b) The national pollutant discharge elimination system (NPDES) program, as delegated to the State of Texas, requires permits for the discharge of pollutants from any point source to waters in the state. Such permits are designated as Texas pollutant discharge elimination system (TPDES). The terms "NPDES," "pollutant," "point source," and "waters in the state" are defined in Texas Water Code, § 26.001.

(1) The following are point sources requiring TPDES permits for discharges:

(A) concentrated animal feeding operations as defined in Chapter 321, Subchapter B of this title (relating to Concentrated Animal Feeding Operations);

(B) concentrated aquatic animal production facilities as defined in 40 Code of Federal Regulations (CFR) § 122.24;

(C) discharges into aquaculture projects as set forth in 40 CFR § 122.25;

(D) discharges from separate storm sewers as set forth in 40 CFR § 122.26; and

(E) silvicultural point sources as defined in 40 CFR § 122.27.

(2) The TPDES permit program also applies to owners or operators of any treatment works treating domestic sewage, unless all requirements implementing Clean Water Act (CWA), § 405(d), applicable to the treatment works treating domestic sewage are included in a permit issued under the appropriate provisions of Subtitle C, the Federal Solid Waste Disposal Act, the Safe Drinking Water Act, Part C, the Marine Protection, Research, and Sanctuaries Act of 1972, or the Clean Air Act, or under state permit programs approved by the regional administrator as adequate to assure compliance with CWA, § 405.

(3) The executive director may designate any person subject to the standards for sewage sludge use and disposal as a "treatment works treating domestic sewage" as defined in § 305.2 of this title (relating to Definitions), where the executive director finds that a permit is necessary to protect public health and the environment from the adverse effects of sewage sludge or to ensure compliance with the technical standards for sludge use and disposal developed under CWA, § 405(d). Any person designated as a treatment works treating domestic sewage shall submit an application for a permit within 120 days of being notified by the executive director that a permit is required. The executive director's decision to designate a person as a treatment works treating domestic sewage shall be stated in the fact sheet or statement of basis for the permit.

**Credits**

**Source:** The provisions of this § 305.1 adopted to be effective June 19, 1986, 11 TexReg 2591; amended to be effective October 8, 1990, 15 TexReg 5492; amended to be effective September 14, 2000, 25 TexReg 8974; amended to be effective July 5, 2006, 31 TexReg 5333.

Current through 50 Tex.Reg. No. 3702, dated June 20, 2025, as effective on or before June 27, 2025. Some sections may be more current. See credits for details.

30 TAC § 305.1, 30 TX ADC § 305.1

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
　　Title 30. Environmental Quality
　　　　Part 1. Texas Commission on Environmental Quality
　　　　　　Chapter 309. Domestic Wastewater Effluent Limitation and Plant Siting
　　　　　　　　Subchapter B. Location Standards

30 TAC § 309.10

§ 309.10. Purpose, Scope, and Applicability

Currentness

(a) This subchapter establishes minimum standards for the location of domestic wastewater treatment facilities. These standards are to be applied in the evaluation of an application for a permit to treat and dispose of domestic wastewater and for obtaining approval of construction plans and specifications. This subchapter applies to domestic wastewater permit applications and construction plans and specifications filed on or after October 8, 1990, for new facilities and substantial changes in the function or use of existing units.

(b) The purpose of this subchapter is to condition issuance of a permit and/or approval of construction plans and specifications for new domestic wastewater treatment facilities or the substantial change in the function or use of an existing unit on selection of a site that minimizes possible contamination of water in the state; to define the characteristics that make an area unsuitable or inappropriate for a wastewater treatment facility; to minimize the possibility of exposing the public to nuisance conditions; and to prohibit issuance of a permit for a facility to be located in an area determined to be unsuitable or inappropriate, unless the design, construction, and operational features of the facility will mitigate the unsuitable site characteristics.

**Credits**
**Source:** The provisions of this §309.10 adopted to be effective March 19, 1990, 15 TexReg 1160; amended to be effective June 5, 1998, 23 TexReg 5723; amended to be effective January 9, 2020, 45 TexReg 370.

Current through 50 Tex.Reg. No. 3702, dated June 20, 2025, as effective on or before June 27, 2025. Some sections may be more current. See credits for details.

30 TAC § 309.10, 30 TX ADC § 309.10

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 5

# Concerns Outside of TCEQ's Authority

**The issues TCEQ can consider when we review a permit application are set by the Legislature through state law. Under those laws, we do not have the authority to consider certain matters when we review a permit application.**

## Issues we can't consider

While TCEQ strives to assist in every way possible, some matters fall outside of our jurisdiction.

- Noise
- Zoning
- Effects on property values
- Light pollution
- Increased traffic (exception: municipal solid waste landfills)
- Effects on local economy
- Historic sites

Receiving a TCEQ permit does not allow an applicant to ignore local or other state requirements.

## Who to contact instead

The agency frequently receives comments about issues outside our jurisdiction. Read this guide to find the right place to address your concerns: **Issues Outside TCEQ's Jurisdiction: Answers to Public Comments We Receive.**

## For More Information

Call or email our Public Education Program at 800-687-4040 or **pep@tceq.texas.gov** if you have questions about the status of applications and the permitting process.

**Pending Permit Applications: Participating in the Process**

**Pending Permit Applications: Documents and Information**

**Participating in Public Meetings and Hearings on Pending Permits**

**Public Participation Opportunities for Different Types of Permits**

**Concerns Outside of TCEQ's Authority**

 **How are we doing? Take our customer satisfaction survey**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 103417097
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief of Appellee City of Georgetown, Texas
Status as of 7/22/2025 9:42 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Patricia Carls | 3813425 | tcarls@tcarlslaw.com | 7/22/2025 9:32:22 AM | SENT |
| William Thompson | 24088531 | will@lkcfirm.com | 7/22/2025 9:32:22 AM | SENT |
| Edmond McCarthy | 13367200 | ed@ermlawfirm.com | 7/22/2025 9:32:22 AM | SENT |
| William Faulk | 24075674 | cfaulk@spencerfane.com | 7/22/2025 9:32:22 AM | SENT |
| John Carlton | 3817600 | john@carltonlawaustin.com | 7/22/2025 9:32:22 AM | SENT |
| Michael Parsons | 24079109 | michael@carltonlawaustin.com | 7/22/2025 9:32:22 AM | SENT |
| Carlota Hopinks-Baul | 24094039 | chbaul@spencerfane.com | 7/22/2025 9:32:22 AM | SENT |
| Helen Gilbert | 786263 | hgilbert@bartonbensonjones.com | 7/22/2025 9:32:22 AM | SENT |
| Kellie E.Billings-Ray | | Kellie.Billings-Ray@oag.texas.gov | 7/22/2025 9:32:22 AM | SENT |
| Sara Ferris | | sara.ferris@oag.texas.gov | 7/22/2025 9:32:22 AM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 7/22/2025 9:32:22 AM | SENT |
| Erin  K.Snody | | Erin.Snody@oag.texas.gov | 7/22/2025 9:32:22 AM | ERROR |
| Maris Chambers | | MChambers@spencerfane.com | 7/22/2025 9:32:22 AM | SENT |
| Andrew Davis | | andrew@lkcfirm.com | 7/22/2025 9:32:22 AM | SENT |
| Todd Disher | | todd@lkcfirm.com | 7/22/2025 9:32:22 AM | SENT |
| John Carlton | | john@carltonlawfirm.com | 7/22/2025 9:32:22 AM | ERROR |
| Kelli Carlton | | kelli@carltonlawfirm.com | 7/22/2025 9:32:22 AM | ERROR |
| Erin Selvera | | erin@carltonlawfirm.com | 7/22/2025 9:32:22 AM | ERROR |
| Yahaira De Lara | | ydelara@bartonbensonjones.com | 7/22/2025 9:32:22 AM | SENT |
| Jennifer Jamison | | jennifer.jamison@tceq.texas.gov | 7/22/2025 9:32:22 AM | ERROR |
| Bobby Salehi | | bobby.salehi@tceq.texas.gov | 7/22/2025 9:32:22 AM | ERROR |
| Evan Greene | | evan.greene@oag.texas.gov | 7/22/2025 9:32:22 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 103417097
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief of Appellee City of Georgetown, Texas
Status as of 7/22/2025 9:42 AM CST

Case Contacts

| Evan Greene | | evan.greene@oag.texas.gov | 7/22/2025 9:32:22 AM | SENT |
|---|---|---|---|---|
| Michael Cotton | | michael@lkcfirm.com | 7/22/2025 9:32:22 AM | ERROR |
| Kelsey Parker | | kparker@spencerfane.com | 7/22/2025 9:32:22 AM | SENT |
| Skye Masson | | Skye.Masson@georgetowntexas.gov | 7/22/2025 9:32:22 AM | SENT |